No. 46,450

NORTHERN NATURAL GAS COMPANY, *Appellant,* v. RONALD F. DWYER, Director, Property Valuation Department, or his successor in office, and the BOARD OF TAX APPEALS of the State of Kansas, *Appellees.*

(492 P. 2d 147)

Opinion filed December 11, 1971.

*Mark H. Adams, II,* of Adams, Jones, Robinson and Manka, of Wichita, argued the cause, and *William S. Richardson,* of the same firm, and *F. Vinson Roach* and *Frank J. Duffy,* of Omaha, Nebraska, were with him on the brief for the appellant.

*Clarence J. Malone,* of Topeka, Chief Attorney, Property Valuation Department, argued the cause, and *John L. Bingham,* of Topeka, Attorney, Property Valuation Department, and *John E. Royston,* of Topeka, Attorney, State Board of Tax Appeals, were with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in an ad valorem tax case from an order of the district court of Pawnee County, Kansas, upholding an order of the State Board of Tax Appeals determining the state-wide 1969 ad valorem assessment of the appellant's interstate natural gas pipeline operating property located in Kansas.

The underlying question on appeal is whether the assessment of the appellant's operating property in Kansas should be invalidated on the ground that the order of the Board of Tax Appeals is unreasonable, arbitrary or capricious.

The interstate gas pipeline and distribution property of Northern Natural Gas Company (appellant) located in twenty-six Kansas counties, including Pawnee County, Kansas, was initially assessed

by the Director of Property Valuation (hereafter the Director) in the amount of $67,528,850 by his order dated May 15, 1969. The foregoing valuation and assessment was appealed by Northern to the Board of Tax Appeals (hereafter the Board) pursuant to authority granted by K. S. A. 74-2438. On the 31st day of July, 1969, the Board heard Northern's appeal and on the 20th day of August, 1969, affirmed the Director's assessment. In so doing, the Board adopted the same justifiable value and assessment that had been made by the Director.

Thereafter, pursuant to K. S. A. 1970 Supp. 74-2426 (effective April 25, 1969), Northern appealed to the district court of Pawnee County from the Board's order approving the valuation and assessment of the Director on the ground that the order was "unreasonable, arbitrary or capricious."

Before the case could be heard in the district court, Northern's first half of the 1969 ad valorem taxes fell due. Northern paid these taxes under protest and duly and timely commenced refund actions pursuant to K. S. A. 79-2005 in each of the twenty-six counties in which its Kansas properties were located. One of these actions has been tried on the merits and appealed to this court; another has come to the court on a procedural point. They have been considered and determined in connection with this appeal and should be read in conjunction herewith. The Rice County action, determined on the merits, is reported in *Northern Natural Gas Co. v. Williams*, 208 Kan. 407, 493 P. 2d 568. The Clay County action, determined on a procedural point, is reported in *Northern Natural Gas Co. v. Bender*, 208 Kan. 135, 490, P. 2d 399.

Two other related cases should be studied in connection with this opinion. They are *Panhandle Eastern Pipe Line Co. v. Dwyer*, 207 Kan. 417, 485 P. 2d 149; and *Panhandle Eastern Pipe Line Co. v. Herren*, 207 Kan. 400, 485 P. 2d 156.

The case at bar was tried in the district court on the 18th day of March, 1970, and the trial court after confining its consideration of the matter to the record made before the Board, and certain other matters of which the Board admittedly had judicial knowledge, on the 30th day of July, 1970, found specifically and generally against Northern and denied Northern's appeal.

Northern's post-trial motions assigned as a ground for reconsideration the discovery of substantial, material evidence not available at the time of the hearing before the Board, whereby it attempted to

pinpoint the fraud, or its equivalent, involved. It is Northern's contention that this newly discovered evidence, consisting of the deposition of the Director's utility appraisal expert, Mike Gillgannon, conclusively demonstrated that the Board did not follow the statutory mandates in arriving at Northern's justifiable value, but rather determined the justifiable value of Northern's operating property in Kansas to be the amount of the original cost undepreciated, and from such predetermined figure worked back by giving lip service to the statutory factors listed under K. S. A. 1968 Supp. 79-503, and manipulating the weight given to alleged indicators of value.

Upon hearing the post-trial motions the trial court withdrew its original order and reconsidered the matter. Contrary to its initial rulings in the case, confining the evidence to the record before the Board, it granted Northern the right to take Gillgannon's deposition and required the Director to produce documents for inspection, copying or photocopying. Questions concerning the admission of evidence under the code of civil procedure were passed until such time as the evidence was marshaled and offered. The trial court thus reversed its original position and allowed Northern's motion for discovery at the post-trial stage of the proceedings. All evidence adduced by Northern as a result of the discovery was admitted in evidence by the trial court and is made a part of the record herein.

While the trial court admitted such evidence, it adhered to its original position and refused to consider the evidence marshaled on discovery upon the ground that the Board had not had an opportunity to consider such evidence at its hearing. In this respect the trial court said:

". . . I am going to exercise my right and prerogative to not consider anything whatsoever in this appeal that may be disclosed by your discovery, that the Board of Tax Appeals did not consider. In other words, I am sticking to my original tenet, that I don't think the Board of Tax Appeals should be considered to be acting in an arbitrary, capricious, discriminatory manner when it was not given an opportunity to consider evidence. . . ."

The foregoing ruling of the trial court raises a procedural point asserted by the appellant which commands our attention.

This court has consistently adhered to the principle that the assessment and valuation of property are administrative functions, not judicial ones, and that courts will not substitute their judgment for that of the assessing authority in the absence of fraud, corruption or conduct so oppressive, arbitrary or capricious as to amount to fraud. This principle has been based upon the considerations

of constitutional law, on the nature of the assessment and valuation functions, and on an inherent lack of power in courts. (*Mobil Oil Corporation v. McHenry*, 200 Kan. 211, 436 P. 2d 982.)

The State Board of Tax Appeals is the highest administrative tribunal established by law to determine controversies relating to assessments of property for ad valorem tax purposes. (*Mobil Oil Corporation v. McHenry*, supra.)

The statute here applicable, K. S. A. 1970 Supp. 74-2426, provides in part:

"[1] Whenever the board of tax appeals shall enter its final order on any appeal, *said board shall make written findings of the fact forming the basis of such determination and final order and such findings shall be made a part of such final order.* [2] Within ten (10) days after its decision the board shall mail a copy of its order by registered or certified mail to the person, firm, corporation or association who was a party to such appeal. [3] Within thirty (30) days after the mailing of the final order of the board, *any party to such appeal may appeal to the district court of the proper county.* [4] *Provided, That no such appeal may be taken to the district court from any order* determining, *approving,* modifying or equalizing *the assessment of property for property tax purposes unless such order is unreasonable, arbitrary or capricious:* . . .

". . . [5] Appeals from any final order made by the board as to ad valorem tax liability shall be to the district court of the county in which the property involved is located, or if located in more than one county, then to the district court of any county in which any portion of the property is located. . . . [6] The appeal shall be taken by filing, with the clerk of the district court of the proper county, a written notice stating that the party appeals to the district court and alleging the pertinent facts upon which such appeal is grounded. [7] Upon filing of the notice of appeal, the director shall be deemed to be a party to such appeal, and the clerk of the district court shall docket the cause as a civil action, and shall forthwith and without praecipe issue summons and cause the same to be served upon the director, in accordance with the manner now provided by law in civil cases. [8] *Jurisdiction to hear and determine such appeals is hereby conferred upon the district courts of this state. Such an appeal shall be heard as an equity proceeding, and shall proceed as an original action.* Trial may be had or any order made in term or vacation.

"[9] *The district courts are empowered to apoint referees,* either standing or special, *to hear the evidence and recommend findings of fact and conclusions of law. The transcript of the proceedings had at the hearing before the board of tax appeals may be admissible in evidence* . . . [10] In hearing and considering any such appeal, the court shall not enforce or give effect to any rule or regulation which it shall find to be unreasonable, arbitrary or capricious." (Emphasis and numbers in brackets are added to facilitate further discussion.)

Despite the provisions in 74-2426, *supra,* making the Director a party to an appeal from an order of the Board (No. 7), it is the *order of the Board* which is the subject of review in the district court on appeal (Nos. 3 and 4). By statute the State Board of Tax Appeals has no capacity or power to sue or be sued. (K. S. A. 1970, Supp. 74-2433; see, also, *Cities Service Oil Co. v. Kronewitter,* 199 Kan. 228, 428 P. 2d 804.) (The order of the trial court making the Board a party defendant, notwithstanding; and the Board's refusal to enter an appearance are inconsequential.) The Board's decisions are administrative in nature, and are subject to limited review just as decisions of other administrative tribunals. This is clearly the import of the provision in 74-2426, *supra,* authorizing appeal to the district court from a final order of the Board approving an assessment of the Director on the condition that the order be "unreasonable, arbitrary or capricious" (No. 4). The provisions (No. 8) conferring jurisdiction upon the district courts to hear such appeal *as an equity proceeding,* and to proceed with such hearing as an *original action* do not detract from this interpretation. The limited review of an administrative decision of the State Board of Tax Appeals in an ad valorem tax case in the district court was referred to in *Mobil Oil Corporation v. McHenry,* supra, as an *equity proceeding* at page 227 of the official report where *Symns v. Graves,* 65 Kan. 628, 70 Pac. 591, was quoted. The mere fact that the statute authorizing appeal refers to the proceeding in the district court as an *original action* (No. 8) does not broaden the scope of review or change the nature of the proceeding. This is clearly the thrust of *Lauber v. Firemen's Relief Association,* 202 Kan. 564, 451 P. 2d 488; and *Rydd v. State Board of Health,* 202 Kan. 721, 451 P. 2d 239.

It may summarily be stated, therefore, on the facts here presented 74-2426, *supra,* authorizing an appeal from an order of the Board of Tax Appeals to the district court, must be construed as authorizing an appeal from an order of an administrative tribunal, in accordance with prior decisions of this court, on the limited issue as to whether the order of the Board appealed from is "unreasonable, arbitrary or capricious." In hearing and considering such appeal the district court is admonished that it shall not enforce or give effect to any rule or regulation which it shall find to be unreasonable, arbitrary or capricious (No. 10).

An attempt has been made by this court to construe statutes authorizing appeals from the decisions of various administrative agen-

cies, boards and tribunals of the state to the district court with some consistency in the area of administrative practice and procedure. In *Keeney v. City of Overland Park,* 203 Kan. 389, 454 P. 2d 456, the court observed:

"Over the years, the scope of judicial review of actions by administrative bodies had been of perplexing concern to the bench and bar of this state. The confusion has apparently arisen because of the creation of an ever increasing number of administrative agencies, boards and tribunals, each with its own peculiar statutory provisions. The present case, like others reaching this court recently (see, *e. g., Rydd v. State Board of Health,* supra [202 Kan. 721, 451 P. 2d 239]; *Lauber v. Firemen's Relief Association,* supra [202 Kan. 564, 451 P. 2d 488]; *Kansas State Board of Healing Arts v. Foote,* supra [200 Kan. 447, 436 P. 2d 828, 28 A. L. R. 3d 472]; *Board of County Commissioners v. Brookover,* 198 Kan. 70, 422 P. 2d 906; *Moyer v. Board of County Commissioners,* supra [197 Kan. 23, 415 P. 2d 261]; *Lira v. Billings,* 196 Kan. 726, 414 P. 2d 13), clearly demonstrates the need for legislation providing for greater uniformity in the areas of administrative practice and procedure and judicial review of administrative decisions." (p. 395.)

In *Keeney* the district court, after noting that a transcript of the hearing before the city council in a zoning matter was available, and apparently relying on our decision in *Bodine v. City of Overland Park,* 198 Kan. 371, 424 P. 2d 513, ruled that the transcript before the city council would be admissible in evidence, and further, that the court would confine itself only to evidence relating to the matters heard by the city governing body along with any exhibits or documentary evidence that were likewise submitted and considered by the council in making its decision. It was said, however, the district court misconstrued our decision in *Bodine* with respect to what evidence may be considered on appeal to the district court from the decision of an administrative tribunal. In *Keeney* the court said:

"The rules of evidence (Art. 4) of the new code of civil procedure apply to the proceeding in district court. (*Bodine v. City of Overland Park,* supra [198 Kan. 371, 424 P. 2d 513].) These rules recognize as a fundamental principle that the primary test of admissibility of evidence is its relevancy to the issue in dispute, and that all relevant evidence is admissible unless limited by the various exclusionary rules. (See, Gard, Kansas Code of Civil Procedure, Annotated, § 60-407, pp. 370, 371.) Thus, a district court, in determining the reasonableness of the action of a city governing body, is not necessarily limited to those matters considered by the city fathers. Within the framework of issues made up by the pleadings or at pretrial conference, the court may receive and consider any evidence relevant to the limited question of reasonableness. The test of relevancy should not depend on the availability of a full and complete transcript of the proceedings before the city governing body.

In actual practice, the proceedings may or may not be recorded. If a record is made, as it was here, it is relevant and admissible in the district court. Parties attacking the reasonableness of an ordinance should not be precluded from the presentation of relevant evidence showing unreasonableness, even though such evidence was not presented to the governing body. This is not meant to imply that the hearing in district court should be a retrial on the merits of the zoning application, irrespective of whether or not a record was made of the city council's proceedings; neither does it imply that a party may lie in wait and ambush the other side at the district court hearing. The district judge remains armed with his usual discretion in admitting or rejecting evidence, and his rulings will not be disturbed unless substantial rights of a party are thereby affected. (See, *Bodine v. City of Overland Park,* supra.)" (p. 394.)

On the hearing of an appeal in the district court from an order of the State Board of Tax Appeals, the provisions of 74-2426, *supra,* authorizing the district court to appoint referees to hear the evidence, and further reciting that the transcript of the proceedings had at the hearing before the Board of Tax Appeals *may* be admissible in evidence (No. 9), inferentially indicate the legislative intent of the statute to be in accordance with the rules stated in *Bodine v. City of Overland Park,* supra; *Rydd v. State Board of Health,* supra; and *Keeney v. City of Overland Park,* supra.

Therefore, in construing 74-2426, *supra,* and adhering to our prior decisions, we hold the rules of evidence (Art. 4) of the new code of civil procedure apply in the trial of an ad valorem tax action brought to the district court by an appeal pursuant to 74-2426, *supra,* and the district court may receive and consider any evidence relevant to the limited issues presented upon review of the administrative order or decision.

*Board of County Commissioners v. Brookover,* 198 Kan. 70, 422 P. 2d 906, upon which the trial court relied, must stand on its own peculiar facts. There the Board of County Commissioners of Shawnee County was denied injunctive relief in an action against the State Board of Tax Appeals. The State Board of Tax Appeals on complaint of a resident taxpayer had previously directed the Board of County Commissioners to reappraise all Shawnee County real estate subject to a general property tax, uniformly and equally at thirty percent of its justifiable value pursuant to K. S. A. 79-1439. (Note the Board was not sitting as an appeal board.) A complete record was made before the administrative board at a hearing, where all parties had a full opportunity to present their evidence, and the resulting order of the Board was challenged in the district

court because it was *not supported by the evidence* and constituted an act that was arbitrary, capricious, oppressive, illegal and so grossly contrary to public interest as to constitute constructive fraud. On such issue the court said bad faith was not indicated by evidence which was not before the Board for consideration at the time its decision was made. The Board of County Commissioners there asserted an extraordinary legal remedy because no remedy by appeal from such an order was available. By amendment, effective April 25, 1969, 74-2426, *supra*, authorizes an appeal, on the facts here presented, from the Board's decision in an ad valorem tax matter appealed to the Board, and this court is called upon to construe the provisions authorizing an appeal of this nature.

Accordingly, we conclude the trial court should have considered the deposition of Gillgannon and other documentary evidence discovered by the appellant in its determination of the limited issue before it. The evidence excluded was clearly relevant and went directly to the issue presented in the trial court. This is not to say the trial court was required to give such evidence credence, in whole or in part.

The foregoing infirmity does not, however, preclude further review on appeal. All of the evidence presented to the Board which the trial court considered (the transcript, the exhibits and documentary matters of which the Board had judicial knowledge), and all of the evidence which the trial court refused to consider on appeal from the order of the Board in this case (the deposition of Gillgannon and his working papers) was documentary in form. This court has recognized that under certain circumstances when the evidence is written, documentary in character, or in the form of depositions or transcripts its duty is to decide for itself what the facts establish, substantially as it would in an original case. (*Boese v. Crane*, 182 Kan. 777, 324 P. 2d 188; *Watson v. Dickey Clay Mfg. Co.*, 202 Kan. 366, 450 P. 2d 10; *Thompson v. Thompson*, 205 Kan. 630, 470 P. 2d 787; and cases cited in these decisions.)

On this state of the record the Supreme Court will review the entire record to ascertain whether the order entered by the Board was "unreasonable, arbitrary or capricious," substantially as it would in an original action. In this context the deposition of Gillgannon and other documentary evidence rejected by the trial court in reaching its decision will be reviewed along with the other evidence presented in the record to determine the matter.

Another procedural point is asserted by the appellant. It is claimed the Board in entering its final order on appeal from the decision of the Director of Property Valuation failed to make written findings of fact forming the basis of such determination and final order as required by 74-2426, *supra* (No. 1).

While the Board did make what was denominated written findings of fact, our analysis of its written findings discloses they are mere conclusions which fail to give the basis for its determination and final order. The findings should have been specific setting forth the factual basis for the Board's determination. But on the record here we do not regard the failure of the Board to make basic findings of fact fatal to further review. (See *Cities Service Gas Co. v. State Corporation Commission*, 201 Kan. 223, 440 P. 2d 660.)

The appellant in its brief observes there is apparently no substantial dispute between the parties with respect to the facts. The appellant says the dispute is largely over the manner in which the undisputed facts are to be applied. The valuation and assessment of the appellant's Kansas operating properties were determined from the rendition made by the appellant to the Director of Property Valuation as required by law. The rendition was identical to the annual report of the appellant submitted to the Federal Power Commission for the year ending December 31, 1968, and to the annual report of the appellant submitted to the State Corporation Commission for the same year. The method used in arriving at the valuation and assessment of the appellant's property by the Director was presented in the form of evidence to the Board hearing the appeal from the Director's order.

Inferentially the conclusions, denominated findings of fact made by the Board and entered as a part of its order approving the Director's valuation and assessment, indicated the factual basis upon which the order was entered. The method by which the appellant's Kansas operating properties were valued and assessed was the basis of the appellant's attack in the trial court. There is nothing mysterious in the record concerning the factual basis for the Board's order or the method by which the appellant's Kansas operating properties were valued and assessed. Our review of the record will disclose and discuss it at some length.

Mike Gillgannon was the Director's expert utility appraiser. His duties as an employee of the Property Valuation Department specifically involved the valuation of pipeline companies for the Di-

rector. In 1969 he appraised and assessed sixty-three companies. He appraised and assessed Northern's property and his determinations made under the supervision of the Director were fully adopted by the Director. The Board heard Northern's appeal and in approving the assessment of Northern's property by the Director thereby adopted the same justifiable value and assessment that had been made by the Director.

It should be noted our review of the record is to determine whether the Board's order is unreasonable, arbitrary or capricious; but since the Director by statute is a party to this appeal and not the Board, for whom the Director appears, our discussion will refer occasionally to the Director's appraisal, assessment or action. These references should not be misconstrued to alter the fact that the court is in reality reviewing the order of the Board.

Northern says in its brief:

". . . Northern's position essentially is that the evidence establishes fraud or its equivalent, requiring a judgment setting the order of the Board aside and invalidating it."

Northern is a "natural-gas company" engaged in the transportation of natural gas for resale in interstate commerce. Its pipeline and interstate gathering facilities are located in several midwestern states and are regulated by the Federal Power Commission (F. P. C.) under the Natural Gas Act (15 U. S. C. § 717, *et seq.*). Under this regulation it is permitted to earn only a specific rate of return computed on a "rate base" which in general terms is referred to in the record as "original cost less depreciation." This depreciation for all practical purposes here under consideration is 3½% straight line annual depreciation. As of January 1, 1969, Northern's effective F. P. C. rate of return was approximately 6.8% of the F. P. C. rate base. Within Kansas Northern, through its Peoples Division, is also regulated by the Kansas Corporation Commission, which permits Northern to earn only upon a rate base of the depreciated original cost of the property at a rate of 6.5%.

Northern's annual report as of December 31, 1968, filed with the F. P. C. discloses a "Total Gross Utility Original Cost Investment" of $1,069,274,448. It also shows a deduction for "Depreciation, Amortization and Depletion" of $345,201,339, thus yielding an F. P. C. rate base ("Total Net Utility Original Cost Investment") of $724,073,109. Of this total 20.89% is attributable to Kansas. Computed, this amounts to $148,755,008 or $151,258,872, depending

upon the treatment of materials and supplies and gas stored underground outside Kansas.

The foregoing figures are undisputed and the parties concede that Northern's properties must be appraised on a system-wide basis, allocating the proper portion to each state. The amount attributable to Kansas is undisputed.

Northern's income statement for the year ending December 31, 1968, made in its annual return to the Director under the heading "Utility Operating Income" shows "Operating Revenues" of $302,-790,644 for the entire utility system. "Total Operating Expenses" are shown as $254,303,138. The calculation reveals "Net Operating Revenues" of $48,487,506. Among the "Operating Expenses" listed and deducted from "Operating Revenues" are: "Depreciation expense" of $35,223,898; "Income taxes" of $14,609,500; "Provision for deferred income taxes" of $425,000; and "Income taxes deferred in prior years—Credit" of $5,181,000.

The foregoing lines (numbered) in the annual return to the Director are specifically defined in the F. P. C. "Uniform System of Accounts." The Director calls our attention to the F. P. C. regulations which permit recapture in cash from gross revenues of depreciation, amortization and income taxes (current and future) as being peculiar and explainable only as a part of a rate fixing format. The Director contends they should *all* be considered by an appraiser striving to determine the system-wide justifiable value.

From the rendition submitted to the Director by Northern, identical to the annual F. P. C. report, the Director's determination of Northern's Kansas justifiable value was $225,096,190. Applying a 30% rate to the determination of justifiable value resulted in an assessed valuation by the Director of $67,528,850.

Gillgannon used two approaches to arrive at his appraisal of Northern's operating properties. All expert appraisal witnesses, including Northern's, conceded the market data approach was not applicable to the appraisal of pipeline utility properties because there is no evidence of comparable sales. Gigantic public utilities of this nature are not sold in the open market. According to Gillgannon's sworn testimony before the Board, supported by his working papers introduced as exhibits, he arrived at the justifiable value of Northern's operating property in Kansas (1) by trending the cost of Northern's property, and (2) by capitalizing the 1968 net utility operating income of Northern at 5.5%. He then assigned

a weight of 85% to the trended cost figure, and 15% to the capitalized income indicator to arrive at a justifiable value of $225,096,190. This determination of justifiable value exceeded the original *undepreciated cost* of Northern's property in Kansas by approximately $3,000,000. Gillgannon also recognized that the Director's determination of justifiable value exceeded the "depreciated" original cost of Northern's Kansas property by approximately $76,000,000.

The trended cost of Northern's Kansas property was determined by Gillgannon as follows:

"Trended cost is synonymous with reproduction cost less depreciation. The process is started by using original cost as a base. This figure is trended or indexed according to the Handy Whitman Index. It is then depreciated by 3.5% and to this amount is added the amount of new investment or new plant for that year, representing the reproduction cost less depreciation for the current year. The process is simply repeated each year thereafter. The process was started with an original cost figure of 1947, which was the earliest data available to the Department. . . .

"For the first year (1947), the original cost total plant was indexed by one. In other words, the current trended cost cumulated was identical with the original cost for the year 1947. In 1948, according to the January edition of the Handy Whitman Transmission Index, there was an index value of 1.101. This index was applied to the previous year's original cost of $32,101,573. This amount was depreciated 3.5% by applying the factor .965. To this was added the new plant, which had been added between the years 1947 and 1948. The resulting figure, which was a trended cost figure for 1948, was $38,568,853. In 1949, this last figure was indexed up by 1.056, which was the relative change in the Handy Whitman Index between the years 1948 and 1949. The resulting figure was again depreciated by .965 and to this was added the new plant of $5,916,575. This yielded a trended cost cumulated of $45,219,979. By use of this trended cost method, I arrived at a trended cost value of $232,101,655."

It is to be noted the 3½% depreciation used by Gillgannon to arrive at his trended cost was calculated on the declining balance method.

A prior decision of this court in 1963 discussing trended original cost and cost of reproduction new less depreciation in determining proper standards of valuation for rate making purposes is *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 386 P. 2d 515.

The reason assigned by Gillgannon for using the reproduction cost less depreciation as distinguished from the "depreciated" original cost was stated as follows:

"A. Well, I feel that in most instances, the original cost is not as valid a measure, or at least has less validity as a measurement of value than reproduc-

tion cost less depreciation, for several reasons. Original cost, at the time of the new construction of a project, would probably be of primary value then, because it should represent the actual cost as of that moment, or that time, but as time goes on, the value of original cost, it diminishes, principally because of two factors that immediately start to work on this particular cost item; one is the effect of inflation, the other is the factor of depreciation, and this, over the years, would tend to minimize the validity of original cost in itself as a true measurement of value.

"Q. In using the reproduction cost new less depreciation, do you use a trending method, and if so, tell what it is, and how you use it?

"A. Well, this is the one particular factor I think that enhances the value of reproduction cost less depreciation measure over that of original cost, because of the trending factor that we use, which in itself, appreciates the property according to changes in today's dollar, or it accounts for the inflationary effects."

Gillgannon's testimony discloses the Property Valuation Department also used another trending index known as the Engineering News Record Index. These indices are generally accepted by engineers and tax commissions throughout the country and they supply a practical method to determine trended value. The yields result in negligible error. The Handy Whitman Index was designed primarily to apply to the electrical industry as well as to the gas industry. For that reason the Handy Whitman Index was given preference in trending the values in the gas pipeline industries.

Northern does not question the Handy Whitman Index used by Gillgannon. It merely questions the application of it to the facts in this case.

The Director calls our attention to evidence in the record which supports the use of the trended cost valuation approach and why this approach should be given great weight. Northern's annual report for the year 1968 discloses that its *earnings* on common stock per share from operations increased from 1 cent per share in 1932 to $3.98 per share in 1968. Except for a few minor adjustments the earnings progressively increased year after year. In 1948 the earnings per share were $1.56, and the increase in earnings per share since that time *has all occurred under F. P. C. regulation.* In 1948 the market price of its common stock ranged from a high of 18⅝ to a low of 12⅞. Each year since 1948 the market price of Northern's common stock, considering only the high, progressively increased until 1965 when its high was 65½ and its low was 57. In 1966 the high was 59¼ and the low was 41⅞. In 1967 the high was 54 and the low was 44⅞. In 1968 the high was 59½ and the low

was 48¼. Similarly, the dividends paid on common stocks per share since 1948 have increased gradually from 90 cents to $2.60 per share in 1968.

The gross value of Northern's property in 1930 was $20,100,000. In 1948 it was $102,600,000, and in 1968 it was $1,270,700,000. Its miles of pipeline increased from 4,900 miles in 1948 to 25,200 miles in 1968. Its gas reserves estimated in trillions of cubic feet increased from 4.3 in 1948 to 14.6 in 1965. The system's salable capacity in millions of cubic feet of gas daily increased from 437 in 1948 to 2,487 in 1968. The number of communities served by Northern in 1930 was 44; the number served in 1948 was 242; and in 1968 it had increased to 1,051 communities served. In 1968 alone 17 new communities were added which it served.

Northern's record is clearly one of constant growth and by far the largest portion of this growth was accomplished under F. P. C. regulation.

In explaining the 5.5% capitalization rate Gillgannon testified before the Board:

"A. The cap rate, as established, was premised to a large extent on the cost of long term debt and total capital over a five-year average, and much of the capital structure of companies today, I believe, represents old term debt, much of it at two and a half percent, four percent, and so forth. And this cap rate actually represents capitalization of net income with depreciation extracted from that net income, so in reality, it is a cap rate representing only return on investment, and not return of investment, so if there was an allowable in there for return of investment, it would be a higher rate. I capitalized the 1968 net operating income of Northern Natural.

"Q. For 1968?

"A. Yes. Well, I used that figure—now, there were three different computations of capitalized income, the five-year—I mean, the current—pardon me—year, income capitalized, the three-year average capitalized, and the five-year average capitalized, and I think your question was, which one was used in making a final judgment, and it was the current net operating income capitalized.

"I think current income in most instances probably more accurately and realistically indicates the future income, or prospects of income.

.   .   .   .   .   .   .   .   .   .   .

"In my determination of a 5.5% capitalization rate, I had a five-year average return on equity of 5.74%, the five-year period being consecutively through 1967. The data was extracted for the most part from Moody's, and the companies included Northern Natural Gas Company, Panhandle Eastern and Kansas Power and Light Company. Mr. Morford who was then Supervisor of Utilities was the one who made the choice of the companies and they were chosen because he considered them to be comparable. He did much of the

research on it and I'm not sure of all the ingredients that went into it really. It is really true that I accepted a figure of 5.5% on the basis of studies made by somebody else.

"Q. What part of the study did you make?

"A. Well, I reviewed part of the material from Moody's and I made some of the computations, and actually Mr. Morford made some of the computations, and actually Mr. Morford made the judgment as to the companies to use in the study. The study was made in mid-year of 1968. I think that's a pretty good statement to make, because it was drawn out over a period of time. It wasn't all done at one time.

"Q. (By Mr. Adams) Then you are using a study made in mid-year of 1968 to develop a cap rate for the purpose of capitalizing income as of January 1, 1969, is that correct?

"A. Well, that could be true, yes.

"The figure of 5.18% was based on the five-year average return on the total capital, over the same five-year period by Mr. Morford. The equity figure of 5.74% is really a price-earnings ratio."

Immediately following the above testimony of Gillgannon before the Board counsel for Northern stated: "For the record, I have decided to release the Director, Ron Dwyer, from the subpoena. I don't believe we will need his testimony." Northern had subpoenaed Dwyer *duces tecum.* The subpoena directed him to produce "all of the documents, schedules, forms, writings, memoranda, assessment sheets, work papers, valuations, records, or other thing or things" pertaining to Northern's 1969 valuation "that may show, or purport to show, the method or formula used by the State in determining the valuation and assessment of such property."

Northern contends the original cost less depreciation of Northern's property allocated to Kansas constitutes the ceiling beyond which a determination of value in the state of Kansas cannot be validly made. It is argued that until such time as the regulatory commissions involved allow a rate of return comparable to the current demand of the investor, the actual justifiable value of Northern's property in Kansas must continue to be less than its original cost less depreciation.

Northern attempts to establish through its expert witnesses that neither the F. P. C. nor the Kansas Corporation Commission will consider any evidence of value whatsoever (for rate making purposes) except original cost less straight line depreciation, because this is the rate base upon which Northern is permitted to earn a return on its investment. Northern contends it is pointless to com-

pute and unreasonable to consider reproduction cost less depreciation as an indicator of value for an F. P. C. regulated company.

It is interesting to note the position taken by the public utility in a rate case before the Kansas Corporation Commission where trended original cost and reproduction cost new less depreciation are asserted in the valuation of its property for *rate making* purposes. (See *Southwestern Bell Tel. Co. v. State Corporation Commission,* supra.)

Northern's expert witness, Dr. Herbert B. Dorau, testified that currently and historically the F. P. C. has not allowed a fully adequate rate of return to Northern or to other similarly situated pipeline companies which would allow the return of combined cost of equity, cost of preferred stock and cost of long-term debt equal to *presently demanded* rates of return by prudent investors. He testified that the capitalization of income is ultimately the economic basis for the value of income producing property. He determined Northern's net utility operating income for 1968 by adding the investment tax credit and interest charged to construction, which resulted in an adjusted utility operating income of $52,264,013. He capitalized this figure at the rate of 8.5%, resulting in a capitalized value of Northern's utility property of $614,870,741. The portion allocated to Kansas was $128,426,498. In arriving at the 8.5% capitalization rate Dr. Dorau *examined* the primary money market, the bond market, the cost of preferred stock, and the common stock equity discount rates.

He testified that if a purchaser should happen to pay for Northern's Kansas property the Director's valuation in the amount of $225,096,190, there is no conceivable way under past and present policy of the F. P. C. that the purchaser could recover the excess over the original cost less depreciation of $151,258,872.

Northern's other expert witness, Browley Travis, appraised Northern's total system property in the amount of $681,098,000, and the Kansas portion thereof in the amount of $142,281,000. He arrived at this value by utilizing on a total system basis the original cost less depreciation of Northern's property, the capitalization of its 1968 net utility operating income at 8.5%, and a computation of the value of Northern's stock and debt for 1969. To this stock and debt indicator value he assigned only 10% weight, while giving 40% to original cost less depreciation and 50% to capitalized income. He testified that reproduction cost had no place in the valuation of a utility regulated by the F. P. C. and its use was unreasonable.

Before proceeding further it is necessary to have the *applicable* statutes in mind.

K. S. A. 79-422 provides that public utility property should be listed and taxed as is provided by law for real estate.

K. S. A. 79-501 provides for the valuation of nonexempt real property at its justifiable value in money.

K. S. A. 1968 Supp. 79-503 provides for the determination of justifiable value as follows:

"Justifiable value shall mean the value of real estate which is arrived at after applying factors hereinafter set forth.

"To arrive at the justifiable value of real property the assessor or appraiser shall actually view and inspect the property. The price at which real property would sell at auction, forced sale or any transaction in which personal elements were a factor regarding the sale price shall not be taken into consideration in determining the justifiable value. In determining the justifiable value of real property, the assessor or appraiser shall *consider* that value in money arrived at when the following factors or combinations thereof are *considered:*

"( a ) The proper classification of lands and improvements;

"( b ) the size thereof;

"( c ) the effect of location on value;

"( d ) depreciation, including physical deterioration or functional, economic or social obsolescence;

"( e ) cost of reproduction or improvements;

"( f ) productivity;

"( g ) earning capacity as indicated by lease price or by capitalization of net income;

"( h ) rental or reasonable rental values;

"( i ) sale value on open market with due allowance to abnormal and inflationary factors influencing such values;

"( j ) comparison with values of other property of known or recognized value; and

"( k ) valuations of land and improvements on the basis of the foregoing elements and such other elements as may be just and proper.

"It shall be unlawful to determine justifiable value of real property in any manner other than authorized and provided for in this section. Any person authorized to assess or equalize property shall consider class, location, productivity, rental values and capitalization." (Emphasis added.)

K. S. A. 79-1439 ( L. 1963, ch. 460, § 1) requires that all real and tangible personal property, which is subject to general property taxes, shall be assessed uniformly and equally at 30% of it *justifiable value.*

In determining the validity of assessments of real property for taxation, the essential question is whether the standards prescribed by 79-503, *supra,* have been considered and applied by taxing offi-

cials, or intentionally and grossly disregarded. (*Garvey Grain, Inc. v. MacDonald,* 203 Kan. 1, 453 P. 2d 59.) Compliance with the provisions of the statute is mandatory upon assessing officials in assessing real property, but the factors or combinations thereof to be considered in determining justifiable value may not all be pertinent to a specific property. What factors apply depends on the individual type of property, after consideration has been given to all of the factors.

Northern contends the Director failed to consider the statutory factors: (*d*) depreciation, including physical deterioration or functional, economic or social obsolescence; (*f*) productivity; (*g*) earning capacity as indicated by lease price or by capitalization of net income; (*i*) sale value on open market with due allowance to abnormal and inflationary factors influencing such values; and (*k*) such other elements as may be just and proper.

From Northern's brief its greatest concern under 79-503 appears to be that the Director failed to apply and account for any economic obsolescence. Northern relies upon the testimony of its expert witnesses to the effect that the only cost indicator which made any sense to apply to the facts in this case was *original cost less depreciation.* (Note this factor is not specifically enumerated, but see [*e*].) It is argued to the extent that a reproduction of trended cost was computed exceeding the original cost less depreciation of the same property, it failed to deduct economic obsolescence resulting from regulation.

Economic obsolescence was defined in a New York case dealing with the assessment of real property in *Piazza v. Town Assessor of Town of Porter,* 228 N. Y. S. 2d 397, 16 A. D. 2d 863 (1962). The court there dealt with the definitions of functional and economic obsolescence. It said "functional obsolescence" with respect to the valuation of property for taxation is loss of value brought about by the failure or inability to deliver full service, and includes any loss of value by reason of shortcomings or undesirable features contained within the property itself and is a loss of utility and failure to function due to inadequacies of design and deficiencies in the property. The court said "economic obsolescence" with respect to valuation of property for taxation is a loss of value brought about by conditions that environ a structure such as a declining location or down-grading of a neighborhood resulting in reduced business volume.

*Obsolescence* in "A Dictionary for Accountants" (3rd Ed.), by Eric L. Kohler, is defined as:

"The loss in usefulness of an asset, occasioned by the approach to the stage of *economic uselessness through progress of the arts; economic inutility arising from external causes.* Obsolescence refers to *disappearing usefulness* resulting from invention, change of style, legislation, or other causes having no physical relation to the object affected. . . ." (Emphasis added.)

In *Southeastern Bldg. Corp. v. Commissioner of Int. Rev.,* 148 F. 2d 879 (5th Cir. 1945), it was said:

". . . It thus becomes apparent that while the rental value of the property fluctuated, its life is in no wise diminished, *and to grant taxpayer the relief it here seeks would be the equivalent of aiding it to recoup fluctuation losses.* Manifestly, the life of the property has many years to run, and it can be used throughout its normal life. *The unprofitable nature of a business or the mere shrinkage in value of commodities is not a sufficient basis upon which to predicate an allowance for obsolescence.* . . ." (p. 880.) (Emphasis added.)

Giving consideration to economic obsolescence consistent with its definition in the foregoing authorities and applying it to the facts in the case at bar, we cannot find that Northern is entitled to the economic obsolescence it claims. This finding is fortified by the phenomenal growth of Northern throughout the period of time it has been subjected to F. P. C. regulation.

Regulation by the F. P. C. must in the long run be regarded as flexible. The rate of return can be changed and the rate base can be changed. At some future time the F. P. C. rate base determined on the basis of original cost less 3½% straight line annual depreciation may prove unrealistic and deny the utility the right to earn a fair and reasonable return on its investment. But where the plant and its facilities are rapidly expanding on a system-wide basis, and income taxes and other fringe benefits are deductible from operating revenues before calculating the permissible rate of return, the present F. P. C. formula may be functioning properly for rate making purposes. (*Permian Basin Area Rate Cases,* 390 U. S. 747, 20 L. Ed. 2d 312, 88 S. Ct. 1344; *Re Lockport Light, Heat & Power Co.* [1935] 12 P U R [N. S.] 413; *Re Panhandle Eastern Pipe Line Co.* [1954] 3 P U R 3d 396; 79 A. L. R. 2d 1134; and *Warburton v. Warkentin,* 185 Kan. 468, 345 P. 2d 992, 79 A. L. R. 2d 1114.)

The cases recognize a definite distinction between the valuation of public utility property for rate making purposes, determined pursuant to statutes applicable thereto, and the valuation of the same

property pursuant to different statutes for ad valorem tax purposes. (See *Southwestern Bell Tel. Co. v. State Corporation Commission*, supra.)

It is apparent from the record the Director gave consideration to all factors enumerated in 79-503, and applied the pertinent factors. Gillgannon, after arriving at the current value of Northern's property, took a 3½% deduction for depreciation, amortization and obsolescence. This annual depreciation covered all types of depreciation, physical deterioration and obsolescence, both functional and economic.

The factors of productivity and earning capacity as indicated by capitalization of net income were applied by capitalizing the F. P. C. net operating revenues of Northern by 5½%.

The factor of "sale value on open market with due allowance to abnormal and inflationary factors influencing such values" was considered and applied to the extent it was applicable. The parties conceded utility property on a system-wide basis was not sold in the open market, and thus no market data was available. But the value of Northern's common stock as indicated by its listing on the New York stock exchange was applied in determining the 5½% capitalization rate. The allowance for abnormal inflationary factors will be discussed later.

The "cost" approach to which the Director gave 85% weight was determined by using the accepted appraisal technique of "reproduction cost new less depreciation." This approach applied the factor listed in 79-503 (*e*) "cost of reproduction or improvements." Apparently Northern would like to ignore this factor.

The only other factor deserving comment is consideration of original cost. While original cost depreciated was the basis of Northern's value for F. P. C. rate making purposes, for ad valorem tax purposes, it was considered but found to be inapplicable. The original cost was applied to the extent that it formed the basis for the trended cost. The explanation why Gillgannon relied more heavily on the trended value has been stated.

In 1969 the legislature enacted a new law for the valuation of the property, both real and personal, tangible and intangible, of all public utilities. (K. S. A. 79-5a04 [L. 1969, ch. 434, § 4] effective January 1, 1970.) It was amended in 1971. (L. 1971, ch. 295.) The Director argues the valuation of Northern's property followed precisely the policy subsequently adopted by the legislature in the new law.

The Director compared the justifiable value determined for Northern with values of other public utilities as disclosed by Exhibit "C", which was introduced as an exhibit for the state at the hearing before the Board. Exhibit "C" shows the ratio of original assessment to original cost, to depreciated cost and to trended cost of ten gas pipeline public utilities. It shows the ratio of the original assessment to the original cost to be near 30% for all companies, varying less than one percentage point for all except one of the companies. This exhibit discloses the existence of a "bench mark" (hereafter discussed) in the State Department of Property Valuation used to check valuations of public utility properties to see that they are equalized and uniform. For the Kansas-Nebraska Natural Gas Company the ratio was 25.28%. This was occasioned by a reduction in the assessed valuation of this company by the old Board of Tax Appeals (See L. 1969, ch. 369), and of which Northern makes complaint on this appeal.

Another basic premise upon which Northern attacks the valuation and assessment is the capitalization rate used by Gillgannon and adopted by the Director in the valuation of Northern's Kansas properties. Gillgannon used a 5.5% while Northern's expert witnesses used an 8.5% capitalization rate. This higher capitalization rate was premised upon the theory that it was equal to the *presently demanded rates of return by prudent investors.* Northern argues that even Gillgannon admitted the cost of current money on January 1, 1969, would be between 7½% and 8¼%.

While each party attacks the capitalization rate used by the other, it is to be noted both Gillgannon and the expert witnesses for Northern applied their respective capitalization rates to the F. P. C. "Net Operating Revenue" of Northern as heretofore stated.

The 5½% capitalization rate applied by Gillgannon has been fully discussed. In support thereof the Director argues the F. P. C. "Net Operating Revenue" is tax free, because all taxes, including income tax, have been taken out before determining the net figure. He also argues the capitalization rate actually represents capitalization of net income with depreciation extracted from it.

The extent to which fully depreciated property is still in use by Northern's utility system, resulting from accelerated depreciation, represents a return of investment to Northern over and above capital consumed. This is additional income and can be used for capital additions to the utility system.

On this point Justice Hughes in *Lindheimer v. Illinois Tel. Co.,* 292 U. S. 151, 78 L. Ed. 1182, 54 S. Ct. 658, said:

". . . As the allowances for depreciation, credited to the depreciation reserve account, are charged to operating expenses, the depreciation reserve invested in the property thus represents, at a given time, the amount of the investment which has been made out of the proceeds of telephone rates for the ostensible purpose of replacing capital consumed. If the predictions of service life were entirely accurate and retirements were made when and as these predictions were precisely fulfilled, the depreciation reserve would represent the consumption of capital, on a cost basis, according to the method which spreads that loss over the respective service periods. *But if the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the service rendered and thus to keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return."* (pp. 168, 169.) (Emphasis added.)

The record shows compressor stations of Northern at Clifton, Mullinville, Bushton and Sublette, Kansas, to be fully depreciated, yet still in operation. (Total F. P. C. depreciation occurs in slightly over 28½ years.) Their original cost was approximately $47,265,000 total. Under Northern's theory this property has no value for tax purposes, but the Director contends it is producing income and has a value which is subject to ad valorem taxation.

The Director contends the 5½% capitalization rate was comparable to the 5½% yield on tax free United States government bonds on January 1, 1969.

The 8½% capitalization rate asserted by Northern as the proper rate to be used in determining its justifiable value tends to take undue advantage of abnormal inflationary controls prevalent in our economy on January 1, 1969. At that time inflationary psychology had gripped our nation and it was of serious concern to the Federal Government. As a result of governmental policy the Federal Reserve Board in an effort to dampen inflation psychology of the people took action to force interest rates higher. A graphic illustration showing the result of action by the Federal Reserve Board may be shown from an exhibit in the record disclosing the bank prime loan rate from 1952 to 1969. As late as November 13, 1968, the bank prime loan rate was 6¼%. For a period of approximately two years prior to that date the rate fluctuated narrowly between 5½ and 6%. But from November 13, 1968, the rate began to climb. On December 2, 1968, it was 6½%; on December 18, 1968, it was 6¾%; on January 7, 1969, it

was 7%; on March 17, 1969, it was 7½%; and on June 9, 1969, it was 8½%.

It is apparent the legislature by enacting 79-503, *supra,* intended to avoid the effect of abnormal and inflationary factors which influenced the values of real property subject to ad valorem taxation. It specifically stated in 79-503 (*i*) "sale value on open market with due allowance to abnormal and inflationary factors influencing such values." By "due allowance" the legislature meant the valuation and assessing officials should discount such influences affecting the valuation of property for ad valorem tax purposes.

Giving due consideration to the foregoing observations and other evidence in the record, we find the application of a 5½% capitalization rate to the F. P. C. net income of Northern to be within the realm of administrative judgment and not unreasonable, arbitrary or capricious.

In an effort to pinpoint the fraud or its equivalent which is attributed to the Board by Northern, it asserts the deposition of Gillgannon, the Director's utility appraisal expert, which it contends conclusively demonstrates that the Board did not follow the statutory mandates in arriving at Northern's justifiable value, but rather determined the justifiable value of Northern's operating property in Kansas to be the amount of the original cost undepreciated.

On the 20th day of May, 1970, the deposition of Gillgannon was taken under circumstances heretofore related. The trial before the Board of Tax Appeals was conducted on July 31, 1969. In his deposition Gillgannon testified he left the employ of the Kansas Property Valuation Department in February, 1970. In the deposition Northern was attempting to lead Gillgannon into giving certain answers which contradicted his previous testimony before the Board. Gillgannon had testified that the capitalization rate was a rate which a company would feel it had to have for the servicing of all debt; to return the amount of investment in the company over a period of years; and also to allow a reasonable profit to the company. He said he was never completely satisfied that the original depreciated cost was a proper base for determining ad valorem tax value and being guided by this thinking was inclined to give greater consideration to the reproduction cost less depreciation as a measurement of justifiable value. He then testified:

"Q. Why was more weight given to the cost approach than to the income approach?

"A. Well, actually I believe it was the thinking at the time that the cost approach was more truly representative of company value, but it had been a policy of the—and this is a policy that had been established over the years, that to arrive at and maintain uniformity of assessment and appraisal—or appraisal rather, that we adhere closely to or maintain a level close to original cost. And I might say that the arithmetic values that were applied to—if I were questioned on how I arrived at 85 per cent or 15 per cent, it was largely arbitrary in adjusting a final result of justifiable value so that they would closely approach 30 per cent of original cost.

"Q. Let me see if I understand your testimony. Are you saying that it was predetermined that the value of this company was going to be approximately 30 per cent of original cost for tax purposes in 1969 in the State of Kansas, and that Defendant's Exhibits 13, 14 and 15 and Defendant's Exhibit 12 are all prepared as an afterthought in an effort to justify the predetermined and arbitrarily arrived at value?

"A. Well, I don't know that—Actually, I suppose it would be construed as predetermined, but really original cost has been over the years considered to be a reliable bench mark in an effort to maintain uniformity in the appraisal of various companies.

"Q. Let me ask this in another way. Are you saying that the work papers and the appraisal process which you went through in order to arrive at a determination of justifiable value of Northern Natural in 1969 in the State of Kansas and the assessment of Northern Natural's properties did not actually play any real part in the fundamental or ultimate determination of that justifiable value which in fact was approximately 30 per cent of original cost?

"A. Well, I wouldn't say that they didn't—didn't play a real part in it, but I will say that the—original cost was very influential in making a final judgment as to what the justifiable value would be.

"Q. I thought your testimony just a moment ago was that 15 per cent weight was given to the capitalized income approach and 85 per cent weight given to the cost approach which was a trended or a RCLD type approach, is that correct?

"A. This is true.

"Q. What weight in the determination of the justifiable value of this company was given to original cost?

"A. Well, there was no arithmetic weight given to it other than that 30 per cent of—or a figure close—or a relative value of 30 per cent of original cost is considered to be—had been considered over the years to be a reliable procedure in effecting a uniform appraisal for all companies.

. . . . . . . . . . . . .

"Q. This is to say then, if I am understanding you correctly, that you were directed by Mr. Dwyer to arrive at a justifiable value determination for Northern Natural Gas Company in 1969 which would approximate 30% of original cost?

"A. Well, I think possibly that that is putting in a fairly severe—

"Q. How would you put it?

"A. Well, I would say that it was just indicated that this would seem to

be the better policy to follow, that is, to be guided by staying within the limits of or within the area of 30% of original cost and close to the prior year's appraisal.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Mr. Adams:   .  .  .   What I meant to say and what I now say is that as I understand your testimony there is a directive, whether it be an understood directive, whether it be in a more physical nature which would require employees of the Property Valuation Department and particularly yourself in connection with the assessment of Northern Natural Gas Company to arrive at an assessment value of Northern Natural Gas Company's property in 1969 which would approximate 30% of original cost?

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"A. Well, I am lost a little now. If I understand the last question I believe I would have to say that I don't—I don't recall that it was specifically stated that I actually was instructed to place the property of Northern Natural Gas Company specifically at 30% of original cost, but it was—it was—I can't think of the proper term really to specify it. It was the feeling that in the appraisal of all of these companies that we would adhere to the previous policy of—of maintaining our appraisals in their relationship to—in a uniform relationship to original cost and generally speaking it was and had been accepted that we would—that 30% of original cost was good measurement to adhere to.

"Well, I'd dislike to say that it was—or accept that it was predetermined, but in view of the fact I guess it could be construed that way in view of the fact that there was a definite influence because there was a tendency, of course, not to deviate too far from 30% of the original cost or away from the benchmark.

"Q. Specifically, is this the reason why only 85% weight was given to the trended cost study?

"A. Well, I think that the answer to that would have to be yes in view— and I regret the fact actually that there was any arithmetic value given to either one of the indicators."

On cross examination by counsel for the Director Gillgannon testified:

"Q. Now, do you know exactly what the Director did with this return?

"A. Not exactly, no. I imagine that he perused it and decided on whether there should be any—

"Q. At that point he exercised his judgment?

"A. His judgment, yes.

"Q. And are you stating under oath that you were directed at any time, impliedly or otherwise, to predetermine a value of original cost and then work toward that value? Are you saying that you were directed by anyone to do that?

"A. Yes, it was. As a matter of fact, there was a meeting in the Director's office in which Mr. Jones and I were present—Mr. Rook (sic) was not present this particular day—and it was suggested that we not deviate notably from the previous year's appraisal.

"Q. You see, that is not what I am asking you. I am asking you if—let's make it even more specific, and I want this—a direct answer from you, yes or no. Has Mr. Dwyer at any time directed you to disregard other factors and to establish an original cost as a value of this company?

"A. The answer to that is no. That is—

"Q. Did Mr. Jones at any time direct you to disregard all other factors and to consider original cost only?

"A. No, Mr. Jones did not."

From a study of Gillgannon's testimony before the Board and a consideration of his testimony given by deposition, we cannot find the Board fraudulently predetermined that original cost was the value of Northern's property, and that the Board worked backward by giving only lip service to statutory factors.

The Director maintains that original cost less depreciation, asserted by Northern, should not be used to reflect market value for Kansas ad valorem tax purposes. For many years the Director and his predecessors declined to be governed solely by regulatory body rate base findings in determining justifiable or fair market value. Greater weight has been given to reproduction cost less depreciation rather than rate base. The appraisal practice used for many years in the Department of Property Valuation by trending the original cost, which took into account both appreciation and depreciation as indicators to arrive at current market value on assessment date, brought the result in close proximity to the original cost figure in appraising public utilities, and as a result the original cost undepreciated had been considered a "bench mark." This does not mean the final determination of value is original cost undepreciated. The record is replete with exhibits proving that many indicators of value were used and correlated in making the determination.

A situation of this nature was discussed in *Nashville, C. & St. L. Ry. v. Browning,* 310 U. S. 362, 84 L. Ed. 1254, 60 S. Ct. 968, where it was said:

". . . Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text. . . . It is not the Fourteenth Amendment's function to uproot systems of taxation inseparable from the state's tradition of fiscal administration and ingrained in the habits of its people." (pp. 369, 370.)

We do not find the recognition of a "bench mark" by the Property Valuation Department in the appraisal of public utility property for ad valorem tax purposes, resulting from many years of experi-

ence, to be objectionable or unlawful. The "bench mark" was indicated by the state's Exhibit "C" introduced in evidence before the Board at its hearing on July 31, 1969, to show equalization and uniformity in the assessment of public utility properties similar to Northern's property.

Considering the circumstances under which the deposition testimony of Gillgannon was taken, its credence is subject to discount, if it be construed as reflecting arbitrary action on the part of the Director or the Board. The Director exercises independent judgment in approving the valuation of property by personnel in his department, and the Board exercises its judgment anew and independent of the Director in approving the valuation and assessment of property. Whether the Board determines the matter of property valuation before it as an appeal board or as a board of equalization, it functions independently of the Director in matters of administrative judgment and decision. It is the order of the Board which is here for review.

The extent to which Gillgannon's deposition testimony may be construed as having departed from his testimony before the Board subjects the probative value of his deposition testimony to impairment.

Northern contends the Kansas Constitution has been violated (Art. 11, § 1) by the Director's method of assessing Northern's property at 30% of original cost, which Northern claims is fraudulent and intentionally discriminatory because it unconstitutionally classifies Northern and other natural gas companies separately from all other taxpayers.

Northern's assertion on this point is premised upon its interpretation of Gillgannon's deposition that the Director assessed Northern's property at 30% of original cost. This assumption on Northern's part is found to be without merit and as a result its argument on the point fails.

Northern's property in accordance with the statutes heretofore cited was valued as real property, its justifiable value determined in accordance with the provisions of 79-503, *supra*, and it was assessed at 30% of its justifiable value. (K. S. A. 79-1439 [L. 1963, ch. 460, § 1].) This is the basis upon which all nonexempt real property in the state of Kansas is valued and assessed. It makes for uniformity and equality in the rate of assessment and taxation.

Two gas pipeline utility companies, Natural Gas and Kansas-

Nebraska Natural Gas Companies, were granted a reduction in their assessments by the old Board of Tax Appeals before it went out of existence on July 1, 1969. (L. 1969, ch. 369.) These isolated orders reducing utility assessments do not disclose a failure on the part of the Board to equalize, where an honest effort has been made in determining valuations and assessments on a state-wide basis for public utilities in accordance with the statutory mandates. Evidence offered by Northern to show these reductions in assessment do not support its allegation that the new Board has been unreasonable, arbitrary and capricious because it did not give a similar reduction in assessment to Northern. Uniformity is maintained only by assessing property at 30% of its justifiable value in accordance with statutory mandates.

Northern contends that evidence of the local level of assessment in the various counties was improperly ignored. It argues that the Director's order purports to assess Northern's property at the rate of 30% of justifiable value. Northern asserts the evidence it adduced shows that all other real property in the various counties involved was being assessed at different and appreciably lower levels.

*Beardmore v. Ling,* 203 Kan. 802, 457 P. 2d 117, is cited for the proposition that:

"Uniformity in taxation implies equality in sharing the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in the rate of taxation. . . ." (Syl. ¶ 2.)

There the court held that an assessment ratio study made pursuant to statute was admissible in evidence as tending to establish the assessment ratio of real estate, even though it was not conclusive on the subject.

Evidence presented before the Board consisted of the 1968 sales ratio study indicating the level of assessment on January 1, 1969, in those twenty-six counties in Kansas where Northern's property is located. The Real Estate Assessment Ratio Study shows two counties with a ratio of only 10% (Meade and Kiowa), one at 15% (Seward), one at 17% (Finney), and one at 11% (Gray). All of these counties with the exception of Gray County have reappraised and new higher assessments were to be expected in 1969. Apparently, Lincoln County has also reappraised in 1969. The assessments occasioned by the reappraisal in these counties were not available when this matter was heard by the Board in July, 1969.

The average ratio for all other counties in which Northern has property is slightly over 21%. The evidence consisted not only of the ratio study itself, but of the testimony of Dr. Francis Woodard responsible for the preparation of the study under the supervision of the Director. Northern then introduced exhibits showing not only the level of assessment in each county but also what the proper assessment in each county would be upon the basis of the appraisals made by its two expert appraisers. Needless to say, had the Board applied the formula asserted by Northern it would not have assessed Northern's property at 30% of justifiable value in each of the twenty-six counties. The rate of assessment in each of the twenty-six counties would have been different.

The Board found:

". . . The Ratio Study relates assessment levels with limited sales, but does not afford direct comparison with all elements included in justifiable value in accordance with K. S. A. 79-501 and 79-503, as amended, . . ."

The Board further found that Northern's property is not assessed relatively higher than other comparable property in Kansas.

The same point was presented to this court in *Panhandle Eastern Pipe Line Co. v. Dwyer*, 207 Kan. 417, 485 P. 2d 149, involving the state-wide assessment of Panhandle's pipeline property in the state of Kansas. In that opinion, to which we adhere, this court said:

"We are forced to conclude that the ratio study standing alone is not conclusive as to value. In *Cities Service Oil Co. v. Murphy*, 202 Kan. 282, 447 P. 2d 791, we held:

" 'Ratio studies provided for by K. S. A. 79-1436 are proper evidence of justifiable value but such evidence, standing alone, is not conclusive in establishing a basis for comparison in determining uniformity of values for assessment purposes.' (See, also, *Beardmore v. Ling*, 203 Kan. 802, 457 P. 2d 117.) It might also be suggested that the 1969 legislature passed a law, (K. S. A. 79-503 [*j*] not made applicable to this case, stating:

" '. . . The ratio study shall not be used as an appraisal for appraisal purposes.'

"It would at least indicate the legislature was not out of harmony with the decisions of this court.

"There are too many speculative elements involved and too few properties are subject to sale for the ratio study to be relied on for appraisal purposes. It may, however, serve as a signal that a reappraisal is in order." (p. 423.)

*Northern Natural Gas Co. v. Williams*, 208 Kan. 407, 493 P. 2d 568, discusses and considers the ratio study in more detail.

On the record here presented we hold Northern has not by the

ratio study or the testimony of Dr. Woodard presented sufficient evidence of any quality to justify a reduction of its assessment in each of the various counties where the ratio study purports to disclose an assessment at less than 30% of justifiable value.

Finally, Northern contends the order of the Board violates the Fourteenth Amendment to the United States Constitution on the ground that grossly excessive valuation of property for ad valorem tax purposes contravenes the due process clause, and requires no showing of discrimination. (Citing *Great Northern Ry. v. Weeks*, 297 U. S. 135, 80 L. Ed. 532, 56 S. Ct. 426.)

Northern asserts the right to equal treatment under the equal protection clause of the Fourteenth Amendment to the United States Constitution and Article 11, Section 1 of the Constitution of the state of Kansas.

The whole argument proceeds on the assumption that the valuation of its property was grossly excessive for ad valorem tax purposes. On this point, however, Northern has failed to sustain the burden of proof to show that its property has been valued excessively.

In conclusion we hold the order of the Board dated August 20, 1969, appealed from herein, was not unreasonable, arbitrary or capricious. The order was lawful in all respects and the Board applied the required statutory standards of value to Northern's Kansas operating property. The order was based upon and in accordance with the evidence before it. The validity of the order was not shaken by the deposition testimony of Gillgannon, which was taken after his services for the state were terminated, and after the hearing before the Board. A thorough review of the record discloses no evidence that the Board has acted under the influence of improper motive, or acted in an unreasonable, arbitrary or capricious manner. The variation in valuations presented in the record stems basically from the difference of opinion of the witnesses and the contending parties to the litigation. The Board's action in the valuation and assessment of Northern's Kansas operating property falls well within the realm of administrative judgment.

The judgment of the lower court is affirmed.

This opinion was approved by O'CONNOR, J., prior to his resignation from the court.

PRAGER, J., not participating.

SCHROEDER, J., concurring: I agree fully with the foregoing opinion except for the consideration given by the court to the real estate assessment ratio study and the evidence pertaining thereto. On this point I concur only in the result—that is, that the trial court did not err in affirming the order of the State Board of Tax Appeals as to the valuation and assessment of Northern's property on a state-wide basis.

Inferentially, the court's recognition of the ratio study evidence and consideration of the question recognizes the validity of such issue where property is assessed on a state-wide basis by the Director of Property Valuation and on appeal by the State Board of Tax Appeals. With this proposition I cannot agree.

First, both the Director and the Board in the valuation and assessment of property on a state-wide basis were *required by statute* to assess Northern's properties *at 30% of justifiable value.* Recognition of the ratio study issue where an attempt is made to show a disparity in the assessment level of the various twenty-six counties involved could, upon a showing by satisfactory evidence, force a departure from the statute and recognize authority in the Board to assess at a lower percentage of justifiable value than the 30% required by statute. (K. S. A. 79-1439 [L. 1963, ch. 460, § 1].)

Second, it could require the state to assess the portion of state assessed property attributable to a given county at a different percentage rate for each of the various twenty-six counties within the state in which Northern had property.

Third, none of the local county officers or assessing officials is a party to this action, and therefore, would not have an opportunity to defend the assessment levels in the various counties as being in compliance with the mandate to assess at 30% of justifiable value. Thus, the Board would not have jurisdiction over indispensable or necessary parties to issue an order of this nature.

Fourth, recognition of the issue is inconsistent with *Northern Natural Gas Co. v. Bender,* 208 Kan. 135, 490 P. 2d 399. The point here under consideration should be a corollary to the rule in *Bender*; that is, where the Kansas property of an interstate public utility is assessed by the State Director of Property Valuation on a state-wide basis, as authorized by K. S. A. 79-1404, *Fifteenth,* the Director of Property Valuation lacks jurisdiction to determine the assessment level of property in the various local counties involved, but is required to assess the property in accordance with the statu-

tory mandate at 30% of justifiable value for the portion of the property which is attributable to each of the various counties. If discrimination exists at the local county level in the assessment of property, it should be resolved in a protest action under K. S. A. 79-2005 (now L. 1971, ch. 303, § 1).

FATZER, C. J., concurring in part and dissenting in part: One of the important issues in this case, and in my judgment the decisive one, is the construction and application of K. S. A. 1970 Supp. 74-2426 (effective April 25, 1969), requiring the Board of Tax Appeals to make findings of fact upon which it bases its determination, and grants the appellant the right to appeal to a district court of a county in which a portion of its property is located, from the final order of the Board approving the assessment of its property, where such order is unreasonable, arbitrary or capricious.

Following our decision in *Board of County Commissioners v. Brookover*, 198 Kan. 70, 422 P. 2d 906, the Legislature in 1969, amended K. S. A. 74-2426. Prior to the amendment, the Board was not required to make written findings of fact, and no right of appeal existed from the Board's order approving an assessment of property for property tax purposes. The statute may be found as K. S. A. 1970 Supp. 74-2426 (since amended, see Ch. 249, L. 1971), and the additions made by the amendment are italicized in the pertinent portions, as follows:

". . . Whenever the board of tax appeals shall enter its final order on any appeal, said board *shall make written findings of the fact forming the basis of such determination and final order and such findings shall be made a part of such final order. Within ten (10) days after its decision the board* shall mail a copy of its order by registered or certified mail to the person, firm, corporation or association who was a party to such appeal. Within thirty (30) days after the mailing of the final order of the board, any party to such appeal may appeal to the district court of the proper county: *Provided,* That no such appeal may be taken to the district court from any other determining, approving, modifying or equalizing the assessment of property for property tax purposes *unless such order is unreasonable, arbitrary or capricious* . . ."

The words "unreasonable, arbitrary or capricious" as used in the statute have reference to an assessment of property for property tax purposes that is illegal, or amount to constructive fraud, or the equivalent of fraud on the rights of a taxpayer.

Other pertinent portions of K. S. A. 1970 Supp. 74-2426 are quoted in the court's opinion and it would be repetitious, and unduly

lengthen this opinion to requote them here. Reference is made in the court's opinion to numbers in brackets which were added to facilitate the discussion of the statute, and the bracketed numbers will be referred to in this discussion.

In amending the statute, it was the evident intent of the Legislature to require the Board of Tax Appeals to comply with basic principles of administrative law repeatedly stated by this court. It has been held that official boards, such as the Board of Tax Appeals, are required by this court to express their orders and decisions in formal and explicit findings to the end that review may be intelligent, *and where the Legislature has imposed a specific requirement that the basic facts conditioning action by administrative boards be stated in findings, such findings shall be stated explicitly.* And in default of such fulfillment, there is no official action—only a vain show of it, with the result that such orders are unlawful and must be set aside and held for naught. (*Southern Kansas Stage Lines Co. v. Public Service Comm.,* 135 Kan. 657, 11 P. 2d 985; *Rock Island Motor Transit Co. v. State Corporation Comm.,* 169 Kan. 487, 219 P. 2d 405; *City of McPherson v. State Corporation Commission,* 174 Kan. 407, 413, 257 P. 2d 123; *Class I Rail Carriers v. State Corporation Commission,* 191 Kan. 201, 380 P. 2d 396; *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 433 P. 2d 572; *Cities Service Gas Co. v. State Corporation Commission,* 201 Kan. 223, 440 P. 2d 660.)

In *Kansas Public Service Co. v. State Corporation Commission,* supra, this court said:

". . . An ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact . . . Such an ultimate finding is not enough, in the absence of basic findings to support it. This court must first know what the basic findings are before it can give them conclusive weight. We have repeatedly emphasized the need for clarity and completeness in basic or essential findings on which the administrative orders rest, and findings based on substantial evidence must embrace the basic findings which are needed to sustain the order . . ." (1. c. 743, 744.)

It was also said:

"The reasons for requiring the findings of basic facts by an administrative agency are so powerful that the requirement has been imposed with undeviating uniformity by this court. The rationale of the rule as gleaned from the foregoing cases and others, is to facilitate judicial review, avoid judicial usurpation of administrative functions, assure more careful administrative consideration to protect against careless and arbitrary action, assist the parties in planning their cases for rehearing and judicial review, and keep such agencies within their jurisdiction as prescribed by the Legislature . . ." (1. c. 744.)

Under the clear and direct language of 74-2426, the Board of Tax Appeals is required to express the basic facts on which it relies with sufficient specificity to convey to the parties, as well as to the courts, an adequate statement of the facts which persuaded it to arrive at its determination. The findings must be expressed in language sufficiently definite and certain to constitute a valid basis for the order, otherwise, the order cannot stand. When a decision is accompanied by findings of fact, the supreme court can determine whether the decision reached by the district court or the Board follows as a matter of law from the facts stated as its basis, and also whether the facts so stated have any substantial support in the evidence. In the absence of findings of fact, the reviewing district court, or this court on appeal, can determine neither of those things. The requirement of findings is, thus, far from a technicality. On the contrary, it is to insure against star-chamber methods of arbitrary, capricious, and unreasonable action, and to make certain that justice shall be administered according to fact and law. (*Kansas Public Service Co. v. State Corporation Commission*, supra.) More will be stated on this point when the findings of the Board's order of August 20, 1969, are set forth and discussed.

Generally speaking, I concur in the court's conclusion that when an appeal is perfected to a district court pursuant to the statute, the filing of the appeal constitutes the commencement of an original action, which shall be heard as an equity proceeding. (*Walkemeyer v. Stevens County Oil & Gas Co.*, 205 Kan. 486, 492, 470 P. 2d 730.) The inherent issue is always: Is the assessment lawful and in conformity with K. S. A. 1968 Supp. 79-503 (since amended)? Likewise, I am in accord that the rules of evidence of the Code of Civil Procedure apply in the trial of such an action. Despite the fact the appeal is from an order of an administrative tribunal, the trial in the district court is *de novo*—in the sense the court may receive and consider any evidence relevant to the issues presented in the action, and is not limited to the evidence presented before the Board of Tax Appeals. This is so because the statute expressly provides [9] that the transcript of proceedings had at the hearing before the Board of Tax Appeals *may* be admissible in evidence. In other words, the district court may hear and consider relevant oral testimony and other relevant evidence procured by discovery, deposition, or pursuant to other available proceedings authorized by the code. The power of a district court to receive and consider relevant evi-

dence is provided for, but that power is not to be employed for the purpose of enlarging the scope of judicial review—the test being, the evidence must be relevant to the limited issues before the district court, namely, whether the order of the Board is "unreasonable, arbitrary, or capricious." But bound up in that phrase is the ultimate question whether the assessment of property for property tax purposes conforms to K. S. A. 1968 Supp. 79-503, that is, whether the assessment is legal, or results in invidious discrimination, which is characterized by our decisions as being constructively fraudulent.

The limitations upon the power of a district court to review by a trial *de novo* the decisions of an administrative body are stated in *Rydd v. State Board of Health,* 202 Kan. 721, 451 P. 2d 239, as follows:

"It is true the appeal statute here (65-504) provides for trial *de novo;* however, as in *Foote,* the statute is to be construed in the light of the constitutional inhibition prescribed by the separation of powers doctrine. This means the legislature may not impose upon the judiciary the function of a trial *de novo* of action of an administrative agency in the sense of authorizing the court to substitute its judgment for that of the administrative agency in matters other than law or essentially judicial matters.

"65-504 authorizes the court to act if it finds the board's order arbitrary, unlawful or unreasonable. The issue, then, before the district court upon appeal is the reasonableness and legality of the order appealed from . . ." (1. c. 729.)

And it was further said:

". . . The lack of uniform requirements and resultant practice in recording evidence supporting administrative action, as well as the indiscriminate use of the term trial *de novo,* has contributed to some confusion in our law and points up the desirability of greater uniformity in our statutes governing hearings by administrative agencies and judicial review of their actions. This problem was recently discussed in *Bodine v. City of Overland Park,* 198 Kan. 371, 424 P. 2d 513, where it was stated that evidence submitted upon judicial review of a zoning action was to be received in accord with our evidentiary code (K. S. A. chap. 60, Art. 4). The trial in district court then is *de novo* in the sense the court may take its own evidence and is not necessarily limited to the evidence presented before the administrative board. The power to receive and consider such evidence, however, is not to be employed for the purpose of enlarging the scope of judicial review—the test being, the evidence must be *relevant* to the limited issue before the court on appeal; namely, the reasonableness and legality of the order appealed from . . ." (1. c. 731, 732.)

The need for the Legislature to enact a uniform administrative procedures act to bring about consistency of judicial review of administrative orders and decisions, is once again strongly sup-

ported by this case, as well as other cases recently considered by this court.

The foregoing requires a concurrence with my colleagues' determination that the district court erred in failing to consider the testimony of Gillgannon submitted in his deposition. That evidence was clearly relevant and went directly to the main issue before the district court. The thrust of Gillgannon's testimony was that the Director of Property Valuation had preconceived the value of Northern's property, as well as the value of Panhandle Eastern's property (No. 46,257), and other similar public utilities, *by instructing the deponent to first compute Northern's justifiable value to reflect* 30 *percent of the original cost, which directive was complied with as will be hereafter demonstrated by quoting from the record, and second, not to deviate substantially from the manner of assessments in prior years.* That gross misconduct by the Director, which was carried out by Gillgannon in practice and by his testimony before the Board of Tax Appeals certainly raised extrinsic issues that should be considered in an original equity proceeding as provided by K. S. A. 1970 Supp. 74-2426. This error was highly prejudicial, and standing alone should require a reversal of this case.

But the foregoing is the extent to which I can agree. In view of conclusion heretofore stated, I am of the opinion this case should be reversed with directions to the district court to remand the issues to the Board of Tax Appeals to carry out its mandatory duty to make essential basic findings of fact.

As indicated, the vice of this case is the order of the Board of Tax Appeals itself. The court did not set forth that order in its opinion and point out its deficiencies. However, the court frankly concedes the order violates the Board's statutory duty to make written findings. Except for a few immaterial statements, the Board's order approving Northern's assessment of property on August 20, 1969, was identical with its order approving the assessment of Panhandle Eastern (No. 46,257, see my dissenting opinion in that case), and other similar public utilities. The Board's order reads:

"BEFORE THE BOARD OF TAX APPEALS OF THE STATE OF KANSAS
"SITTING AS THE STATE BOARD OF EQUALIZATION

"In the Matter of the Appeal of Northern Gas Company, from the Order of the Property Valuation Department Determining Their Assessed Valuation for the Year 1969. } No. 2206-9

"Order

"Now, on this 31st day of July, 1969, the above matter comes on for hearing before the Board of Tax Appeals of the State of Kansas, sitting as the State Board of Equalization.

"The appellant appears by Mark Adams II, Counsel; Frank Duffy, Counsel; Larry Gipe, Counsel; K. R. Boyer, Manager, Tax Department; Dave Wortman, Tax Analyst; O. L. McQuin, Senior Tax Agent; Dr. Herbert Dorau, Consultant; Broley Travis, Consultant; Wm. Fields, Consultant; and Francis O. Woodward, Consultant. The Property Valuation Department appears by Clarence J. Malone, Chief Attorney; Ronald F. Dwyer, Director; and Mike Gillgannon, Appraiser.

"Thereupon the matter proceeds to hearing and evidence is produced by the appellant and the Property Valuation Department of the State of Kansas, which matter is taken under advisement by the Board.

"And now, on this 20th day of August, 1969, after careful consideration of the evidence presented and arguments of Counsel, the Board makes the following findings:

"1. Northern Natural Gas is a Corporation engaged in transporting natural gas in interstate commerce with some subsidiary intrastate operations.

"2. Appellant is under jurisdiction of the Federal Power Commission for purpose of rate regulation. Intrastate Subsidiary Commission operations are under jurisdiction of Kansas State Corporation for the purpose of rate regulation within Kansas.

"3. The contention of the appellant that the sole basis of valuation for assessment of his property should be the value placed upon it by the State or Federal regulatory body establishing rates is in error.

"4. The Board has taken administrative notice of the Kansas Ratio Study for 1968. The Ratio Study relates assessment levels with limited sales, but does not afford direct comparison with all elements included in justifiable value in accordance with K. S. A. 79-501 & 79-503, as amended, which provides the statutory authority under which the Director of Property Valuation is required to assess state assessed properties.

"5. The Board finds that the taxpayer has failed to sustain the burden of proof that the values determined by the 1968 Ratio Study in the counties involved are supported by any substantial evidence.

"6. That we find no evidence of bad faith, arbitrary or oppressive action, or systematic discrimination and distinction made by the Director of Property Valuation between the subject utility and the assessment of other utilities similarly situated.

"7. In the absence of any evidence that the assessment was arrived at fraudulently, arbitrarily, or capriciously, and in the absence of any evidence of arbitrary discrimination between, or a lack of uniformity in, the valuation and assessment of all other utilities similarly situated, a difference of opinion as to value or an alleged error or mistake in judgment by the assessing officer is

no ground for interference by the Board of Tax Appeals, sitting as the State Board of Equalization.

"8. The taxpayer has the burden of proof and has failed to sustain the burden of proof to establish by evidence that the assessment lacks uniformity.

"9. That said property is not assessed relatively higher than other comparable property in this state; the facts presented for the Board's consideration do not justify a reduction; the appeal should be denied and the valuation remain as assessed.

"IT IS, THEREFORE, BY THE BOARD OF TAX APPEALS OF THE STATE OF KANSAS, SITTING AS THE STATE BOARD OF EQUALIZATION, ORDERED that the appeal be, and the same is hereby, denied.

"Dated at Topeka, Kansas, this 20th day of August, 1969."

The court concedes the Board utterly failed to comply with its statutory duty to make essential findings of fact showing the basis of its determination, as stated in the majority opinion:

"While the Board did make what was denominated written findings of fact, our analysis of its written findings discloses they are mere conclusions which fail to give the basis for its determination and final order. The findings should have been specific setting forth the factual basis for the Board's determination . . . ."

The court's concession of the unlawfulness of the Board's order should automatically reverse this case with directions to the district court to remand the proceeding to the Board with instructions that it comply with K. S. A. 74-2426, and make explicit findings of fact showing the basis of its determination. However, and despite the foregoing concession, the court concludes that it does not regard the failure of the Board to make findings of fact fatal to further review. Its conclusion appears to be that the Board's approval of "the assessment of Northern's property by the Director thereby adopted the same justifiable value and assessment that had been made by the Director." The court apparently proceeds upon the assumption that it may infer or imply from the Board's order approving Northern's assessment that the factual basis upon which the order was entered may be ascertained. This is gross error.

This court has passed upon an almost identical procedural question in *Cities Service Gas Co. v. State Corporation Commission*, supra. There, the Commission issued an order directed to several intrastate natural gas pipe line companies operating within Kansas to show cause why they should not be required to obtain a certificate of convenience and necessity from the Commission, and file rate tariffs on charges, and other matters. Following a hearing before the Commission, it issued its order asserting jurisdiction of

the gas pipe line companies pursuant to its own Rule and Regulation No. 82-1-232 relating to proceedings before the Commission. The regulation described the form and content of orders to be issued by the Commission, which required it to make findings of fact, detailing all facts found by the Commission to be true, and to make conclusions of law based upon the facts as found. Upon appeal, the district court concluded as a matter of law that the order of the Commission was invalid and void for failure to make findings, and then as here, searched the record and made its own extensive findings of fact and conclusions of law.

Upon judicial review of the district court's judgment, this court held the Commission's order failed to comply with its own regulations with respect to making findings of fact, and that the order likewise failed to comply with basic principles of administrative law repeatedly stated by this court. The case was reversed with instructions to the district court to set aside its findings of fact and conclusions of law, except its conclusion of law that the order of the Commission was invalid and void for failure to make adequate findings of fact, and directed the district court to remand the case to the Commission for further proceedings consistent with the opinion. In the opinion, this court said:

"In the instant case, there were no basic findings of fact and there was nothing upon which the district court could review the evidence. In the absence of such findings, the district court was not called upon to examine the evidence in order to resolve opposing contentions as to what it showed or to spell out in its own findings of fact and state its conclusions of law as the record might permit. The commission [Board] is the fact finding body, and the court examines the record not to make findings for the commission [Board] but to ascertain whether its findings are supported by substantial evidence. It need hardly be said the district court can neither affirm nor disaffirm findings which were never made. As we have seen, our statute and our decisions and the commission's rule demand that findings be made, and the courts and the parties are entitled to know how the commission disposes of the fact issues. Until that function has been performed, the courts cannot discharge theirs. We conclude the district court was not authorized under 66-118d to make findings of fact where no findings had been made by the commission, and in the absence of such findings, neither the district court nor this court on appeal can review them. Courts cannot perform the function assigned to them in the absence of adequate basic findings. (*Pacific Telephone & Telegraph Co. v. Flagg,* 189 Or. 370, 220 P. 2d 522; *Valley & Siletz R. R. Co. v. Flagg,* 195 Or. 683, 247 P. 2d 639.) In the latter case it was said:

" '*Pacific Telephone & Telegraph Co. v. Flagg,* supra, holds, not only that an order by the commissioner, unsupported by evidence, is invalid, but also

that a court cannot write findings for the commissioner.' (l. c. 717.)" (l. c. pp. 234, 235.)

And it was further said:

"As noted, in the instant case there were no basic findings and there was nothing upon which the district court could review the evidence, and the order was void on its face. As stated in *Kansas Public Service Co. v. State Corporation Commission*, supra, courts will not search the record to ascertain whether there is evidence from which an ultimate finding can be made. Under the circumstances, the district court should have found the order contained no basic findings and concluded as a matter of law it was void on its face, and transmitted *its judgment to the commission*." (l. c. 236.)

Under the authority of the *Cities Service Gas* case, the district court had a clear duty to declare the Board's order void for failure to make basic findings of fact and to remand the proceedings to the Board with directions to comply with its statutory duty. It is obvious from an examination of the Board's order there were no adequate findings made upon which it based a determination approving the Director's assessment of Northern's property for 1969. In the case of *Rydd v. State Board of Health*, supra, the point was decided, and we said:

". . . And we have indicated it would have been beyond the scope of the trial court's authority to make its own independent finding on the merits of appellee's fitness for a license. That function lay exclusively with the board. As the matter stood, the court could have made no conclusive order in favor of either of the litigants without substituting its judgment for that of the board. What course then could have been taken by the trial court other than to remand the proceeding for further hearing? We think none . . . In 2 Am. Jur. 2d, Administrative Law, § 764, the rule is stated:

" '. . . the general rule is that even in the absence of statute, a court which sets aside an administrative determination has the power to remand the case to the administrative agency where such power is necessary to effectuate the demands of justice, and statutes frequently grant such authority to the courts. The court does not encroach upon the administrative function of such procedure, and there is nothing in the principles governing judicial review of administrative acts which precludes the courts from giving an administrative agency an opportunity to meet objections to its order by correcting irregularities in procedure, or supplying deficiencies in its record, or making additional findings where these are necessary, or supplying findings validly made in the place of those attached as invalid.'

"The rule is further elaborated in the same work § 765, as follows:

" 'The court must remand, or the administrative agency is entitled to have the proceeding returned to it, where the agency has taken action without meeting procedural requirements, has made invalid, inadequate, or incomplete findings . . . where judicial review discloses material errors but the reviewing court cannot enter a conclusive order . . .'

"The trial court properly remanded the proceeding."

Likewise, and in my judgment, the court's decision is directly contrary to established administrative law propounded by the court in a settled course of decisions. As indicated, the court apparently proceeds to examine the record to ascertain if the purported findings of the Board may be *implied or inferred* from its order. *This court has repeatedly held that where findings of fact are required as a matter of procedural law in order to support the administrative determination, the lack of express findings will not be supplied, implied, or inferred.* (*Class I Rail Carriers v. State Corporation Commission,* supra; *Kansas Public Service Co. v. State Corporation Commission,* supra; *Cities Service Gas Co. v. State Corporation Commission,* supra.) Our decisions have cited *Atchison Ry. v. United States,* 295 U. S. 193, 79 L. Ed. 1382, 55 S. Ct. 748, and *Burlington Truck Lines v. United States,* 371 U. S. 156, 9 L. Ed. 2d 207, 83 S. Ct. 239, and this court has adopted the following language from *Atchison Ry.,* and *Burlington,* respectively, which may be found in *Class I Rail Carriers,* supra:

" '. . . Its report does not disclose the basic facts on which it made the challenged order. This court will not search the record to ascertain whether, by use of what there may be found, general and ambiguous statements in the report intended to serve as findings may by construction be given a meaning sufficiently definite and certain to constitute a valid basis for the order. In the absence of a finding of essential basic facts, the order cannot be sustained. *Florida v. United States,* 282 U. S. 194, 215. Recently this court has repelled the suggestion that lack of express finding by an administrative agency may be supplied by implication. *Panama Refining Co. v. Ryan,* 293 U. S. 388, 433. See *Beaumont, S. L. & W. Ry. v. United States,* 282 U. S. 74, 86. *Interstate Commerce Comm'n v. Chicago B. & Q. R. Co.,* 186 U. S. 320, 341.' (pp. 201, 202.)"

\* \* \*

" '. . . Expert discretion is the life blood of the administrative process, but "unless we make the requirements for administrative action strict and demanding, (expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion." *New York v. United States,* 342 US 882, 884, 96 L ed 662, 663, 72 S. Ct. 152 . . . The Commission must exercise its discretion under § 207 (*a*) within the bounds expressed by the standard of "public convenience and necessity." Compare id 346 US at 91. And for the courts to determine whether the agency *has* done so, it must "disclose the basis of its order" and "give clear indication that it has exercised the discretion with which Congress has empowered it." *Phelps Dodge Corp. v. NLRB,* 313 US 177, 197, 85 L ed 1271, 1284, 61 S Ct 845, 133 ALR 1317. The agency must make findings that support its decision, and those findings must be supported by substantial evidence . . . (pp. 215 and 216, 9 L. Ed. 2d.)' " (l. c. 208.)

Turning now to Gillgannon's deposition, the clear import of his testimony is that he was directed to predetermine a value of original cost. Then he was to manipulate his work sheets and place percentage weights upon certain valuation methods to achieve a result comparable to a 30 percent value of original cost. I am not prepared to say what effect that testimony might have upon the credibility of his evidence before the Board, or the viability of the Order of the Board; however, the lengthy quotation from the deposition as set out in the court's opinion necessitates additional quotation from the deposition to indicate the inference of preconceived valuation, and that the work product of Gillgannon was merely "frosting on the cake," so to speak. In his deposition he said:

"There was no documented directive in that respect but it was the policy of the Department to use this norm and Mr. Dwyer took the position that we shouldn't deviate from this norm and that we should not go too far afield in establishing appraisals notably different than the prior year unless this was justified by new investment, increases in new plant. This position was made known to me more or less just in a conversation and I think that there was an understanding that this was the policy that would be followed. This conversation and this understanding took place prior to the appraisal in 1969 but with reference to that period. This was more or less in casual conversation with regard to the policy that we would use. It was just indicated that this would seem to be the better policy to follow, that is, to be guided by saying within the limits of or within the area of 30% of original cost and close to the prior year's appraisal."

\* \* \*

"Original cost is value of some sort. It has weaknesses of course. It may be construed to be a very reliable measurement of value at the inception of cost but as years go by original cost does tend to lose its merit in determining the value of the property because of economic factors of appreciation and depreciation which start to work on the property immediately."

\* \* \*

". . . Thirty percent of original cost was a measurement that the Department fell into as being a test of uniformity and in an effort to see whether one company as related to another was—that there is a correlation between the relationship of the appraisal of one company with that of another and originally it was not intended to really represent justifiable value but it got established that way and it has been perpetuated as a reliable test of justifiable value.

"In the Director's determination of justifiable value of Northern's properties in the State of Kansas in 1969, if a greater weight had been given to the cost approach than 85%, this would have resulted in a higher justifiable value. That justifiable value then on an assessment basis would have exceeded the 30% or 30.34% ratio which currently appears in Column C of defendant's Exhibit 17, and this is the reason why no more weight was actually given to the trended cost than the 85%

"A. Well, I'd dislike to say that it was—or accepted that it was predetermined, but in view of the fact I guess it could be construed that way in view of the fact that there was a definite influence because there was a tendency, of course, not to deviate too far from 30% of the original cost or away from the bench-mark.

"Q. (By Mr. Adams) Specifically, is this the reason why only 85% weight was given to the trended cost study?

"A. *Well, I think that the answer to that would have to be yes in view—and I regret the fact actually that there was any arithmetic value given to either one of the indicators.*" (Emphasis supplied.)

* * *

"*I am stating under oath that I was directed to predetermine a value of original cost and then work toward that value.*" (Emphasis supplied.)

* * *

"Q. And are you stating under oath that you were directed at any time, impliedly or otherwise, to predetermine a value of original cost and then work toward that value? Are you saying that you were directed by anyone to do that?

"A. Yes, it was. As a matter of fact, there was a meeting in the Director's office in which Mr. Jones and I were present—Mr. Rook (sic) was not present this particular day—and it was suggested that we not deviate notably from the previous year's appraisal."

* * *

"Q. (By Mr. Carter) As a matter of fact if they had directed you to do that, you wouldn't have to have gone through the trouble of going through these different procedures and exercising your judgment as you have just testified to me that you did, would you?

"A. Well, this is true, but, of course, this is one appraisal practice over the years, that we were tied closely to the original cost as a benchmark.

"In my opinion, this is a weakness."

As previously indicated, I concur with my colleagues on the admissibility and relevance of Gillgannon's deposition as it relates to the issue of extrinsic fraud; however, I emphatically disagree that the questions raised in this case were submitted in the form of mere documentation which would authorize this court to resift the evidence, place probative value on the same, and render a judgment on the merits of that testimony.

This court had analogous situations before it on prior occasions. In *Boese v. Crane*, 182 Kan. 777, 324 P. 2d 188, we stated:

"This court has recognized that under certain circumstances when the evidence is written, documentary in character, or in the form of depositions or transcripts its duty is to decide for itself what the facts establish, substantially as it would in an original case. (*In re Estate of Kemper*, 157 Kan. 727, 145 P. 2d 103; *In re Estate of Besse*, 163 Kan. 413, 183 P. 2d 414; and *White v. v. Turner*, 164 Kan. 659, 192 P. 2d 200.)

"The testimony of Mr. and Mrs. Dimsdale in the trial court was in the form of depositions. All other witnesses were present and testified in person. It is urged that this court apply the foregoing rule in reviewing the decision of the trial court, that is, to treat the case as if it were an original case. This rule, however, is not universally applied under all condiions. It has been applied where *all* the evidence is in written form (*White v. Turner*, supra); where the only oral testimony adduced has little, if any, bearing upon the principal question presented and all other evidence is in written form (*In re Estate of Kemper*, supra); but has not been applied to testimony written in form where the court would be called upon to disregard the testimony of one witness and accept as true the testimony of others (*Bolin v. Johnson County Nat'l Bank*, 160 Kan. 61, 159 P. 2d 477 [deposition testimony]; *Karlan Furniture Co. v. Richardson*, 182 Kan. 756, 324 P. 2d 180, No. 40,871, decided April 12, 1958 [stipulated testimony]; and see, also, *Akins v. Illinois Bankers Life Assurance Co.*, 166 Kan. 648, 203 P. 2d 180).

"The circumstances in the present case do not call for an application of the rule urged by plaintiffs, where all of the evidence is in written form. The ordinary rule, giving credence where the trial court gave credence, as in *Tucker v. Hankey*, supra, and *Truck-Trailer Supply Co. Inc. v. Farmer*, supra, must control this decision. All of the plaintiffs' witnesses testified in person and all of the defendants' witnesses except Mr. and Mrs. Dimsdale testified in person. The deposition testimony of the Dimsdales was corroborated in many respects by one of the defendants' witnesses, and the testimony of the plaintiff, Otto Boese, insofar as the issue in this case is concerned was contradictory to the plaintiffs' evidence. Should the rule propounded by plaintiffs apply, a reversal would require this court to give credence to the testimony of Otto Boese, when as a matter of fact it is apparent that the trial court rejected his testimony. The trial court had the opportunity to observe each of the witnesses who testified in person and familiarize himself with their demeanor on the witness stand, their interest in the controversy, and the greed and avarice manifested by each.

"Under these curcumstances plaintiffs' specfication that the trial court erred in believing the evidence contained in the depositions of Frank and Myrtle Dimsdale is without merit." (1. c. 779, 780.)

In *Karlan Furniture Co. v. Richardson*, 182 Kan. 756, 324 P. 2d 180, we stated:

"In reaching the conclusions last above announced we have not overlooked contentions strenuously advanced by appellants to the effect that since the only evidence of record is in documentary form this court is required to decide for itself what the facts established, substantially in the same manner it would if this were an original case. We have so held. (*In re Estate of Kemper*, 157 Kan. 727, 145 P. 2d 103, and earlier cases therein cited; *In re Estate of Besse*, 163 Kan. 413, 183 P. 2d 414; *White v. Turner*, 164 Kan. 659, 192 P. 2d 200.) It must be remembered, however, such rule is subject to some elasticity under certain conditions. In that connection we have pointed out that even though we determine the facts from the printed page we cannot disregard the testimony of one witness and accept as true the testimony of others but, under such

circumstances, should follow the ordinary rule, giving credence where the trial court gave credence, unless its findings of fact are illogical, improbable and unwarranted. See, *e. g., Akins v. Illinois Bankers Life Assurance Co.*, 166 Kan. 648, 655, 203 P. 2d 180." (l. c. 760.)

See, also, *In re Estate of Bernatzki*, 204 Kan. 131, 460 P. 2d 527.

*The Board is the trier of facts in this case just as the district court was the trier of facts in the Boese and Karlan Furniture Co. cases.* A substantial portion of the evidence presented at the administrative hearing of this matter was garnered from the witness stand. The Board, as the trier and finder of facts, is required to assess the demeanor of witnesses and determine whose testimony is to be believed. It is apparent to me from the record that the district court, which erroneously failed to consider the Gillgannon deposition, should direct the Board to consider that testimony, weigh its credibility and materiality, and then render its judgment after due consideration of that testimony. The position taken by the court's opinion is clearly inconsistent with precedent, and the facts in this case do not compel a contrary result. We should not preempt the Board and substitute our opinion as to the relative probative force of Gillgannon's deposition. That is not the business of this court in reviewing orders of an administrative board, and I am loath to believe the court intends to incur such prodigious responsibilities *in futuro.* A conclusion otherwise would be giving credence to an argument that this court now intends to go into the assessment business and weigh the probative force of that evidence, a function heretofore reserved exclusively for an administrative board. The district court, upon the proffering of Gillgannon's deposition should have remanded the issues to the Board for a proper consideration of the testimony. In light of the oral testimony contained in the record, that error clearly compels a reversal of this case.

In *Garvey Grain, Inc. v. MacDonald,* 203 Kan. 1, 453 P. 2d 59, we held that an assessment, made in adherence to an assessment schedule promulgated by the Property Valuation Department which failed to consider pertinent statutory factors prescribed by the Legislature in K. S. A. 79-503 will not be upheld by this court. In this case, as in *Garvey,* the statutory factors have been lost sight of or wilfully abandoned, and the mere assertion by the Director, or his official who made the assessment, that he *considered* all pertinent factors will not mitigate the admitted facts supplied from his own lips that he did not do so.

The statewide assessment of a public utility is a momentous task. However, since the enactment of K. S. A. 79-503 in 1963, and its subsequent amendments, including K. S. A. 1971 Supp. 79-5a04, effective January 1, 1971, the traditional ways of carrying out the state policy of assessing public utilities have been cast aside. By adopting the rationale of the majority opinion, this court has now entered into the era of the "bench mark" syndrome. For property taxation purposes, the Director is now permitted to consider as one of the factors of K. S. A. 1968 Supp. 79-503, a judicial fiction known as the "bench mark" declared synonymous with original undepreciated cost. As I understand the thrust of the court's opinion, it appears that the Director may now disregard all factors in 79-503 and use the original cost from the prior year, add additional physical outlay of a gas pipe line company for the current tax year, declare that value to be "justifiable," and be in harmony with the majority in this case.

This dissent has grown too long. Much more could be said and possibly should be, but other pressing matters require that it be concluded.