No. 46,466

State of Kansas, ex. rel. Vern Miller, Attorney General, *Appellant*, v. Ronald F. Dwyer, Director, Property Valuation Department of the State of Kansas, *Appellee*.

(493 P. 2d 1095)

Opinion filed January 11, 1972.

*Matthew J. Dowd*, Assistant Attorney General, argued the cause, and *Vern Miller*, Attorney General, and *John R. Martin*, Assistant Attorney General, were with him on the brief for the appellant.

*Clarence J. Malone*, Chief Attorney, argued the cause, and *John L. Bingham* was with him on the brief for appellee.

The opinion of the court was delivered by

Fontron, J.: On March 24, 1971, the Director of the Property Valuation Department of the State of Kansas, Ronald F. Dwyer, (hereafter referred to as director) issued directives to the Boards of

County Commissioners of 96 Kansas counties (being all of the counties which had completed reappraisals) directing each board to convene as a board of equalization and to adopt a resolution directing the county assessor to apply to each class of rural agricultural investment land the valuation per cent changes for the tax year of 1971 as shown in the directive. Each directive further provided that the resolution showing the percentage changes be published in a paper of general circulation within the county. The directives, which were identical except for addressees and percentage figures, were issued in an attempt to comply with the legislative mandate to equalize assessed valuations between adjacent counties as required by K. S. A. 79-1446. A reproduction of one of the directives—in this case issued to Ellis County—is shown as Appendix A following this opinion.

Some two weeks after the directives were issued, the State of Kansas, in the person of its Attorney General acting on the state's behalf, filed the present action seeking a declaratory judgment that the statutes under which the director purported to act were unconstitutional and that his directives were void. The state further prayed for affirmative injunctive relief which would require the director to rescind the directives, to notify the county boards of commissioners to such effect, and to direct the county boards to repeal any resolutions which might have been adopted in compliance with the directives. A restraining order was issued two days after the lawsuit was filed.

After a hearing, the trial court entered judgment in favor of the director, upholding the validity of the directives which were issued and denying the injunctive relief sought. The state has appealed from that judgment, the enforcement of which was stayed by the trial court pending appeal.

Before defining the issues it may prove helpful to sketch, in thumbnail fashion, the procedures employed by the director in computing the blanket percentage changes by which equalization was to be accomplished.

As a first step, the director divided the state into nine districts comparable and homogeneous as to climate, rainfall, crops and cropping practices, hazards, income and expenses, and sales. Among the items considered in identifying soil and land capabilities were texture, depth, permeability, slope, drainage, erosion and terrain. A map is attached hereto as Appendix B, showing the nine districts and the counties encompassed in each.

Lands were classified on a statewide basis into eleven categories: Irrigated, 1 and 2; bottom cultivated, 1 and 2; upland cultivated, 1 and 2; tame grass, 1 and 2; native grass, 1 and 2; and waste. A table was prepared showing the acreage of each type of land in each of the 96 counties involved and the average assessed value per acre. Finally, three tables were prepared for each county: (1) Showing the percentage of adjustment for rural agricultural investment land in each of the categories, these being the percentage changes to be made in equalizing the assessed values in the county with the assessed values throughout the district; (2) disclosing the average assessed value per acre of land in each classification for the year 1970; and (3) containing the 1971 average assessed value per acre for each class of land after application of the percentage adjustments.

The average per acre assessed values for 1971 for the land in each category was computed on the basis of the median of the assessed values throughout the several counties comprising the district, it being assumed that each county assessor had assessed the real estate in his county at 30% of justifiable value (now fair market value).

The first issue raised on appeal is whether K. S. A. 79-1446 violates the due process and equal protection provisions of the federal and state constitutions. As a part of the due process question, the state challenges not only K. S. A. 79-1446 but K. S. A. 79-1602 (now K. S. A. 1971 Supp. 79-1602), as well.

K. S. A. 79-1446 implements K. S. A. 79-1404 *Sixteenth* which invests the director with authority to equalize valuations of property. 79-1446 reads as follows:

"Before September 15 of each year the state director of property valuation shall make a comparison of the fair market values in money of taxable property of each county with the fair market value in money of taxable property of counties adjoining thereto, and shall make a similar comparison with the statewide average of fair market values in money of taxable property. All countywide reappraisals of taxable property, after their final completion, shall be submitted to the state director of property valuation for such a comparison with adjoining counties and with the statewide average. In the event that any annual comparison or any appraisal so submitted shall fail to be substantially equal to that of any adjoining county in the judgment of the state director of property valuation, it shall be the duty of such director to order the county assessor of the offending county to increase or decrease the appraised values of his county to the level of surrounding counties to make all such counties comparable to adjoining areas."

The state contends this statute is constitutionally objectionable in that no provision is made for the giving of notice prior to the time the director acts to equalize the assessments. Since his directives have the effect in many instances of increasing assessed values, although some values are lowered, it is argued that due process requires notice to be given of prospective increases, and opportunity be afforded for hearing.

In our judgment this contention must be rejected. The law recognizes a distinction between the process of assessment, in which individual properties are valued separately, and equalization procedures by which blanket changes are made affecting all or an entire class of properties within a particular assessment or taxing district.

Where an increase in the value placed by the county assessor on *a specific tract of real estate* is contemplated by the county board of equalization, the statutory scheme of this state requires the owner be notified of the proposed increase and that he be given an opportunity to be heard. To this effect, K. S. A. 79-1602 provides in substance that where it becomes necessary, in the opinion of the county board, to increase the assessed valuation of specific tracts or individual items of real estate, *"except where the assessment of a class or classes of property in any area or areas of the county is raised by a general order applicable to all property in such class or classes for the purpose of equalization,"* the county clerk shall give ten days written notice to the person to be affected, stating the proposed increase and fixing the time and place of hearing. It is because of the exception which we have italicized that the state now claims K. S. A. 79-1602 is unconstitutional as violating the precepts of due process.

We are not without respectable precedent in concluding that prior notice is not required by constitutional mandate in the equalization process. The case of *Bi-Metallic Co. v. Colorado*, 239 U. S. 441, 60 L. Ed. 372, 36 S. Ct. 141, reflects a situation quite comparable to that which is now before us. That action was brought to enjoin the Colorado State Board of Equalization and the Colorado Tax Commission from putting into effect an order increasing the value of all taxable property in Denver by forty per cent. The suit was dismissed by the Supreme Court of Colorado.

In affirming the Colorado court's judgment, the United States Supreme Court assumed, for the purpose of its opinion, that

neither the taxpayer nor the local assessor, nor any representative of the city or county was provided an opportunity to be heard other than what they may have had by reason of the fact that the time of the board's meeting is fixed by law. The court went on to say:

". . . On this assumption it is obvious that injustice may be suffered if some property in the county already has been valued at its full worth. But if certain property has been valued at a rate different from that generally prevailing in the county the owner has had his opportunity to protest and appeal as usual in our system of taxation, . . . so that it must be assumed that the property owners in the county all stand alike. The question then is whether all individuals have a constitutional right to be heard before a matter can be decided in which all are equally concerned—here, for instance, before a superior board decides that the local taxing officers have adopted a system of undervaluation throughout a county, as notoriously often has been the case. . . .

"Where a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached as it might have been by the State's doubling the rate of taxation, no one would suggest that the Fourteenth Amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body entrusted by the state constitution with the power. . . . There must be a limit to individual argument in such matters if government is to go on. . . ." (pp. 444, 445.)

In a more recent case, also arising in Colorado, *People v. Hively*, 139 Colo. 49, 336 P. 2d 721, the court had occasion to ponder the question of notice as applying to the equalization function as distinguished from the assessing function. In discussing a section of the Colorado code directing the tax commission to determine whether property within the several counties has been assessed at true and full cash value and should it find the property in any county not to have been so valued, then to determine the increase or decrease in the value required to place the property on the assessment roll at full value, the court said:

"This authorizes the commission to order horizontal increases or decreases in an aggregate flat sum or of a percentage rate. It applies to all property within a county and when exercising this function the commission is not required to make reappraisals, to give notice to or hold hearings for affected taxpayers. It performs in this role in September long after the determination

of individual assessments. This section would be meaningless if the commission were required to notify each and every taxpayer in the county and hear complaints with respect to the increase in valuation. . . ." (pp. 58, 59.)

In an annotation in 84 A. L. R. Tax Assessment—Increase—Notice, p. 198, the rule is stated in this wise:

"In those states where the question has arisen, it has been generally held that notice to individual property owners affected is not required where a general increase is made by a board of equalization or review of the assessed valuations, of all the taxable property in a given division or district (or all the property therein of a certain class), the statutes being generally construed as not requiring such notice, and the requirement being held not essential to due process of law. . . ."

See, also, *Colorado Tax Commission v. Pitcher*, 56 Colo. 343, 138 Pac. 509; 51 Am. Jur., Taxation, § 779, p. 704.

A taxpayer is not left destitute or without remedy to protect himself against arbitrary or capricious action on the part of the director in his administration of equalization procedures. Avenues for the review and correction of arbitrary, inequitable or discriminatory assessments are contained among our statutes. K. S. A. 74-2438 provides that an appeal may be taken to the state board of tax appeals from any finding, ruling, order, decision or other final action of the director of property valuation by any person aggrieved thereby. K. S. A. 79-1413a furnishes another safeguard in providing that when on complaint of any taxpayer to the state board of tax appeals it is made to appear that the assessment of taxable real estate in any county is not in substantial compliance with the law, and that the public interest will be promoted by a reappraisal, the board shall order a reappraisal of all or any part of the taxable property in the district.

Not to be overlooked in this connection is K. S. A. 79-2005 (now K. S. A. 1971 Supp. 79-2005), pursuant to which a taxpayer may pay his taxes under protest and then bring suit for the recovery thereof within the time fixed by the statute.

In *Felten Truck Line v. State Board of Tax Appeals*, 183 Kan. 287, 327 P. 2d 836, a challenge was directed to the statute which imposed a tax upon motor carriers. The challenge was brought on the ground that due process was denied. In rejecting that argument the court stated:

"It is only necessary that at some stage of the assessment proceedings the taxpayer shall have an opportunity, after notice, to appear and contest the assessment." (p. 296.)

The rationale underlying *Felten* was further expressed in the recent case of *State, ex rel., v. Dwyer*, 204 Kan. 3, 460 P. 2d 507, where an attack was launched against what is now K. S. A. 1971 Supp. 79-306c on the ground, among others, that it contravened the due process clause of the 14th Amendment. It was contended in that case that a taxpayer who purchased a car after June 15, the final day on which the county board of equalization met, had no opportunity to appeal his assessment to the board, and thus was deprived of due process and equal protection. In rejecting the argument we called attention to K. S. A. 79-1413a and K. S. A. 79-2005 and stated:

"These avenues of relief remain open to the aggrieved taxpayer after June 15. Their availability satisfies constitutional requirements. . . ." (p. 5.)

But, argues the state, some form of notice to the taxpayer is necessary before he can be placed in a position to avail himself of his statutory remedies of review. In other words, it is argued the taxpayer must be made aware of the change in his assessment. In advancing this argument the state apparently overlooks K. S. A. 79-1412a, (now K. S. A. 1971 Supp. 79-1412a) *Third*, which requires the county assessor, on or before May 1 of each year, to notify each taxpayer by mail as to the assessed value of his real property whenever the assessment has been changed from that of the preceding year.

In the present case, the equalization directives were issued March 24, 1971, and by their specific terms apply to the 1971 tax year. Under the mandate expressed in 79-1412a, it would have been the statutory duty of the county assessor, absent the restraining order issued herein, to notify each taxpayer on or before May 1st of the new assessed valuation resulting from the director's equalization order. This notification would, in our judgment, be sufficient to alert the most comatose taxpayer to the realization that the assessed value of his property had been increased (or decreased, as the case might be) and, if he felt aggrieved, that he had best take advantage of the avenues available to him for review of his assessment. In this connection it would appear that an appeal to the county board of equalization would have been open at this time, as well as the other avenues already mentioned, since under K. S. A. 79-1602, the county board is required to meet not later than the first day in May (now May 15) for the hearing of appeals and remains in session

until the last business day of that month, and thereafter reconvenes from June 5th to the 15th for the same purpose.

The claim that equal protection is denied by K. S. A. 79-1446 needs little discussion at this point. The same effective avenues for review remain open to those who feel aggrieved by the changes wrought in their assessed values by the equalization orders as are open to those who feel aggrieved for other reasons. The directive issued by the director applies to all owners of rural agricultural investment properties alike—none are treated unequally.

Passing to another feature, the state points out that in *Board of County Commissioner v. Brookover,* 198 Kan. 70, 74, 422 P. 2d 906, this court recognized that matters of valuation and assessment are administrative in character. It then asserts, since the equalization function is properly a part of the valuation process, that the legislature has not set up adequate standards to provide guidelines in equalization matters.

We have examined the authorities cited by the state and do not find them persuasive in supporting its position. In two of them, *State, ex rel., v. Fadely,* 180 Kan. 652, 308 P. 2d 537 and *Cities Service Gas Co. v. State Corporation Commission,* 197 Kan. 338, 416 P. 2d 736, this court upheld legislation as supplying sufficient standards for administrative guidance. The *Cities Service* case appears quite in point. There it was held that the statutes in question provided a sufficient standard to govern the commission's exercise of authority to approve or deny applications to waterflood oil and gas wells, the standard being to act in the interest of oil and gas conservation.

Neither *State, ex rel., v. Hines,* 163 Kan. 300, 182 P. 2d 865 or *Johnston v. City of Coffeyville,* 175 Kan. 357, 264 P. 2d 474, are factually in point. The *Hines* case challenged the school reorganization act of 1945. That piece of legislation sought, among other things, to invest county committees with the power to adopt such orders as might be necessary to properly organize, reorganize and disorganize school districts. The lack of standards in this type of legislation is obvious. The statute involved in *Johnston* was likewise wanting in standards in providing that a per cent of construction costs of a highway be paid by the city on an equitable ratio among its taxpayers as the governing body should prescribe.

The duty enjoined on the director by 79-1446 is to equalize the assessed values of property in adjoining counties to the end that

the values are comparable. The technical means of accomplishing this objective must necessarily be left to the director and members of his staff, but the standard seems clear enough, *i. e.*, equalization in the assessed values of comparable property. We believe this to be a ready, comprehensible and sufficient guide for the administrative action required.

It is also claimed that K. S. A. 79-1446 and the action taken thereunder by the director, violates article 11, § 1 of the Kansas Constitution which provides, so far as material, that the legislature shall provide for a uniform and equal rate of taxation. The gist of the state's contention on this point is not too clear, but it cites the case of *Hines et al., v. City of Leavenworth et al.*, 3 Kan. * 186 [2d Ed., 180] which construes the amendment to mean that the rate of taxes must be uniform and equal throughout the jurisdiction which levies them. Apparently the state implies that 79-1446 ignores jurisdictional boundaries and extends the assessment function, through the medium of equalization, beyond territorial limits, thus violating the constitutional provision.

As we view the plan proposed by the director, it does not violate the "uniform and equal" provision as construed in *Hines*. Under K. S. A. 79-1411a the county is declared to be the governmental unit charged with the primary responsibility for the administration of laws relating to the assessment, review, equalization, extension and collection of real and personal property taxes, while 79-1411b provides that each county shall comprise a separate assessment district.

Each of the directives issued by the director applies to a single separate assessment district, namely, the county. The assessed values of the rural agricultural properties, after equalization, remain equal and uniform throughout each county. We find no merit in the suggestion that those values were computed on a district basis. Rather, they were completed on a county-wide basis and equalized thereafter with adjacent counties.

Finally the state would have us hold that the plan designed by the director, and implemented by the directives of March 24, 1971, does not accord with the provisions of K. S. A. 79-1446 but that it violates both the statute and the constitutional command of uniformity. The argument points out that equality exists only between counties which are not adjacent to interior district boundary lines; that as to counties which face each other across district borders, there remains inequality in assessed values. Some lack of

equality cannot truthfully be denied, but we reject the concept that it vitiates or poisons the entire plan.

The problem of disparity in assessed values has long plagued the taxpayers of this state. It has become more acute with the proliferation of taxing districts, such as school and hospital districts, which may embrace territory in two or more counties and which have the power to adopt levies for their own operation, although, as we pointed out in *McManaman v. Board of County Commissioners*, 205 Kan. 118, 468 P. 2d 243, they possess no authority with respect to the valuation and assessment of property.

In the *McManaman* decision this court forcefully called attention both to the inequalities which then existed in the assessed values of real estate between counties and to the duties placed on the director to correct them. On page 127 of the opinion this language appears:

"These clearly defined official duties of the director of property valuation leave no doubt that he has full power and authority to enforce the assessment laws promulgated by the legislature and to insure that all property subject to tax is assessed uniformly and equally."

The attainment of perfection in the area of taxation will seldom, if ever, be likely. So long as imperfection inheres in humankind, the institutions which mankind creates will doubtless be infected with the same virus. But progress does occur from time to time. This is exemplified, we believe, in the plan contrived by the director to equalize rural property values. It is obvious that a great deal of thought, study and research went into its preparation. One cannot read the record without concluding that the director made a sincere attempt to comply with the legislative mandate and the expressions found in the *McManaman* decision.

Although some inequality in assessed values will doubtless exist where counties border on opposite sides of a district boundary there is good reason to believe there will be less disparity and more equality after the the directive is put into effect than was the case when *McManaman* was decided. The change should be for the better. The director makes no claim that his plan is perfect, or that it cannot be improved with further study. But it does furnish, as the director suggests, a basis from which to work.

We find no reason for disturbing the judgment of the trial court and the same is affirmed.

O'CONNOR and PRAGER, JJ., not participating.

## APPENDIX A

### STATE OF KANSAS
### PROPERTY VALUATION DEPARTMENT
### DIRECTIVE

To: The Board of County Commissioners of Ellis County, Kansas.

Re: Equalization of Locally Assessed Rural Agricultural Investment Land.

This directive is issued this 24th day of March, 1971, by the Director of the Kansas Property Valuation Department, under authority granted him by the Statutes of Kansas, K. S. A. 79-1404, and all other applicable statutes.

The question of locally assessed rural agricultural investment properties was considered by the Director, and, upon consideration of all the information available to him, finds that there is need of equalization of the valuation of rural agricultural investment land between your county and other counties in your area.

If you are not presently sitting as the County Board of Equalization, then you are directed to convene or reconvene immediately as the 1971 County Board of Equalization.

The Board of County Commissioners, sitting as the 1971 County Board of Equalization, shall adopt the following resolution:

"We, the Ellis County Board of Equalization adopt this resolution at the direction of the Director of the Kansas Property Valuation Department issued March 24, 1971, and we do hereby direct the Ellis County Assessor to apply to each class, sub-class, grade or sub-grade of land, as shown on each field sheet or property record card in the county, the following valuation percent changes to be effective for the tax year of 1971:

| | |
|---|---|
| Irrigated No. 1 | + 40% |
| Irrigated No. 2 | + 27% |
| Bottom Cultivated No. 1 | + 25% |
| Bottom Cultivated No. 2 | + 35% |
| Upland Cultivated No. 1 | NC |
| Upland Cultivated No. 2 | 10% |
| Tame Grass No. 1 | + 85% |
| Tame Grass No. 2 | + 100% |
| Native Grass No. 1 | + 27% |
| Native Grass No. 2 | + 129% |
| Waste [$6] per acre * | |

and that the County Clerk publish this resolution in some newspaper having general circulation in the county."

Further, you are directed to obtain approval from the Director prior to making any major changes in your present class, sub-class, grade, or sub-grade of rural agricultural investment properties in 1971.

The Board of County Commissioners are hereby further directed to provide the County Assessor with all necessary help and office supplies to implement this directive.

* A dollar amount per A. is to be used for equalization for waste land

NC—No Change.

/s/ Ronald F. Dwyer
Ronald F. Dwyer, Director
Property Valuation Department

# APPENDIX B

EQUALIZATION DISTRICTS

SCHROEDER, J., dissenting: Under the guise of equalization the orders of the Director of Property Valuation result in discrimination equivalent to constructive fraud far greater in magnitude and more flagrant than the facts presented in *Beardmore v. Ling,* 203 Kan. 802, 457 P. 2d 117; *Addington v. Board of County Commissioners,* 191 Kan. 528, 382 P. 2d 315; and *Kansas City Southern Rly. Co. v. Board of County Comm'rs,* 183 Kan. 675, 331 P. 2d 899.

What the court has said in substance is that a little equalization is better than none at all, admitting that "Some lack of equality cannot truthfully be denied, but we reject the concept that it vitiates or poisons the entire plan." Here, however, the Kansas Supreme Court's approval of the orders, which purport to equalize the assessed valuation of farmlands in the state, establishes a dangerous precedent authorizing departure from the constitutional requirement of uniformity and equality in the taxation of property.

I agree with the court's position that the law recognizes a distinction between the process of assessment, by which properties are valued on an individual basis, and the blanket equalization procedures, whereby changes may be made in assessed values *affecting all or an entire class of property* within a taxing district; and that prior notice is not required to be given where equalization of assessed values is affected by means of increasing or decreasing the value *of all taxable property, or a class thereof,* in an assessment or taxing district.

The court, however, has ignored the foregoing law by approving the practice of the Director. Here the Director did not equalize the assessed values of *all or an entire class of property within a taxing district.*

K. S. A. 79-1446 need not be construed as violative of the provisions of either the state or federal constitution. But if this statute be construed as the Director of Property Valuation has applied it in this case, then, in my opinion, it is definitely unconstitutional.

The constitution and the statutes of Kansas demand not only equality of assessment of property as between property owners within a county, but also as between property owners of the state. (*McManaman v. Board of County Commissioners,* 205 Kan. 118, 468 P. 2d 243.)

The requirement of Article 11, Section 1 of the Kansas constitution is that the rate of assessment and taxation must be uniform and

equal throughout the jurisdiction levying the tax. (*Voran v. Wright,* 129 Kan. 1, 281 Pac. 938; and *Wheeler v. Weightman,* 96 Kan. 50, 149 Pac. 977.) If the state levies the taxes, the rate must be equal and uniform throughout the state. If the county levies them, then they must be equal and uniform throughout the county. (*Hines and others v. The City of Leavenworth and others,* 3 Kan. 186.)

Equalization is attempted by the Director in his plan here presented for the entire state, because the state imposes a 1.5 mill tax levy on all taxable property in the state. (See, *Harshberger v. Board of County Commissioners,* 201 Kan. 592, 442 P. 2d 5.)

Under K. S. A. 79-1411a the county is declared to be the governmental unit charged with the primary responsibility for the administration of all laws relating to the assessment, review, equalization, extension and collection of real and personal property taxes; nevertheless, the state as a whole may be said to comprise a taxing unit or district for the purpose of levying state general taxes. (*McManaman v. Board of County Commisisoners,* supra.)

Now just what has the Director of Property Valuation done by his equalization orders in this case? First, he has divided the state into nine districts and has attempted to equalize within each district as if it were a taxing district of the state of Kansas for ad valorem tax purposes. (See the appendix to the court's opinion.) This is contrary to our case law construing Article 11, Section 1 of the Kansas constitution. Second, the Director has attempted to equalize only *"agricultural investment"* property. By legislative definition *"agricultural investment"* property is merely a *subclass* of rural real property within Kansas. It is not *all of the taxable property or an entire class of taxable property within the state* of Kansas, which is the taxing district the Director of Property Valuation purports to cover by his orders. Third, gross discrimination in the assessed valuations of "agricultural investment" property from one district to another is created by the directives.

To give substance to the foregoing charges it is necessary to resort to the statutes in some detail and to spell out what the record discloses.

The statutory enactments designed to enforce the constitutional demand that assessments be uniform and equal in the various counties throughout the state were discussed in *McManaman v. Board of County Commissioners,* supra, where counties comprising a taxing unit or district were not complying with the assessment law. The

State Board of Tax Appeals sitting as the State Board of Equalization has power to equalize assessments between counties of the state under K. S. A. 79-1409 as suggested in *Harshberger v. Board of County Commissioners,* supra.

In *McManaman* the court said:

"Of even greater importance, in our opinion, is that the legislature saw fit to vest ultimate supervisory responsibility for the administration of the assessment and tax laws of the state squarely on the director of property valuation with attending enforcement power and authority. (K. S. A. 79-1401, 79-1402, 79-1404, and 79-1405.) . . ." (p. 126.)

Further discussion following the foregoing quoted statement in *McManaman,* in the form of dictum by the court, spelled out in some detail the legislative directions to the Director of Property Valuation. This statement by the court was unanimously approved, and while the parties to this appeal attempt to construe *McManaman* favorably to their respective view points, I think its directions are clear and require no construction.

The Director of Property Valuation is empowered to exercise general supervision over assessors, boards of county commissioners, county boards of equalization, and other boards of levy and assessment, *to the end that all assessments of property, real, personal and mixed, be made relatively just and uniform* (K. S. A. 79-1404 *First*) and at 30% of its fair market value in money as defined in K. S. A. 1968 Supp. 79-503, as amended. (K. S. A. 79-1439.)

K. S. A. 79-503 (L. 1969, ch. 433, § 10), here applicable, provides in part:

"Fair market value in money shall mean the amount of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting, assuming that the parties thereto are acting without undue compulsion and that the property has been offered at the market place for a reasonable length of time. Sales in and of themselves shall not be the sole criteria of fair market value but *shall be used in connection with* cost, *income and such other factors as may be appropriate including but not by way of exclusion:*

"(a) The proper classification of lands and improvements;

"(b) the size thereof;

"(c) the effect of location on value;

"(d) depreciation, including physical deterioration or functional, economic or social obsolescence;

"(e) cost of reproduction or improvements;

"(f) *productivity;*

"(g) *earning capacity as indicated by lease price or by capitalization of net income;*

"(h) *rental or reasonable rental values;*

"($i$) sale value on open market with due allowance to abnormal inflationary factors influencing such values; and

($j$) comparison with values of other property of known or recognized value. The ratio study shall not be used as an appraisal for appraisal purposes.

"In each county of the state the county assessing officer shall on January 1, 1971, and on January 1 of each year thereafter *classify and subclassify all real estate* into the following *classes*:

"A. *Urban property*
   "1. *Residential.* [Defined]
   "2. *Multifamily.* [Defined]
   "3. *Commercial.* [Defined]
   "4. *Industrial.* [Defined]
   "5. *Vacant lots.* [Defined]

"B. *Rural property*
   "1. *Agricultural investment.* Agricultural *investment shall include those properties presently used and operated as units with a source of economic life from the production of agricultural products that originate from land productivity.*
   "2. *Agricultural noninvestment.* [Defined]
   "3. *Home sites.* [Defined]
   "4. *Planned subdivisions.* [Defined]
   "5. *Spot industrial and commercial.* [Defined]
   "6. *Recreational.* [Defined]

The appraiser or assessor in arriving at fair market value in money may use different factors in determining the classification best suited to arrive at fair market value in money as defined in this section. . . ." (Emphasis added.)

The Director of Property Valuation is empowered under K. S. A. 79-1404 *Sixteenth:*

"To require any county board of equalization, at any time after its adjournment, to reconvene and to make such orders *as the director of property valuation shall determine are just and necessary,* and to direct and order such county boards of equalization to raise or lower the valuation of the property, real or personal, in any township or city, and to raise or lower the valuation of the property of any person, company, or corporation; *and to order and direct any county board of equalization to raise or lower the valuation of any class or classes of property; and generally to do and perform any act or to make any order or direction to any county board of equalization or any local assessor as to the valuation of* any property or *any class of property in any* township, city or *county which, in the judgment of said director of property valuation, may seem just and necessary, to the end that all property shall be valued and assessed in the same manner and to the same extent as any and all other property, real or personal, required to be listed for taxation.*" (Emphasis added.)

It is to be noted from the foregoing statutes that the Director of Property Valuation is empowered to cause a change in the valuation and assessment of any *class or classes* of property, but not of a

subclass of property. In 79-503, *supra*, *"agricultural investment"* property is clearly defined as a *subclass* of rural real property. Rural real property is a class made up of six subclassifications.

By definition, *"agricultural investment"* property includes all farmlands of the state. Why has the defenseless farmer been singled out in the Director's effort to equalize? Is it because the great wealth of the state is comprised of its farmlands? Clearly, isolating a *subclass* of property on a statewide basis for purposes of equalizing property assessments does not comply with the statutory directives pursuant to which the Director of Property Valuation has been given authority to equalize.

Nowhere does the constitution or the statutes enacted by the legislature authorize the establishment of arbitrarily defined districts within the state for the purpose of equalizing the assessment of property within such districts. The districts arbitrarily established by the Director *are not taxing districts* of the state of Kansas. The powers conferred upon the Director by K. S. A. 79-1446, "to order the county assessor of the offending county to increase or decrease the appraised values of his county to the level of surrounding counties *to make all such counties comparable to adjoining areas"* (Emphasis added) cannot be construed to authorize the division of the state into separate districts for the purpose of equalization.

In my opinion 79-1446, *supra*, can be constitutionally construed because each and every county of the state adjoins other counties. If the assessed valuation of property in each county and its surrounding counties in the state is comparable to adjoining areas of the state, it stands to reason that the entire state must be embraced. It is the taxing district for which equalization must be accomplished.

The Director of the Kansas Department of Property Valuation on March 24, 1971, issued directives to 96 Kansas County Boards of Equalization, requiring them to convene or reconvene immediately, and then adopt a resolution directing the county assessor to make certain changes set forth in the directives. The 9 counties not embraced within the directives were in the process of reappraisal in 1971. Under K. S. A. 79-1439 the 9 remaining counties in the process of spreading reappraisals on their tax rolls were within their statutory right to reach full compliance in the year 1971.

The facts in this case are not contested. The director in his answer admitted the material facts alleged by the attorney general in his

petition, including the exhibits attached thereto to substantiate the allegations.

In 1971 prior to the issuance of the 96 directives, the Director conducted a survey of all Kansas rural "agricultural investment" properties in every county in Kansas by a systematic process of classifying and evaluating as indicated by Exhibit No. 2, which reads as follows:

"To properly achieve equalization of rural agricultural investment properties in the State of Kansas, it was necessary to devise a systematic process of classifying and evaluating the characteristics of this *subclass* in order to make a reasonable judgment of the end result.

"There are four characteristics that are inherent in all property that influence value. They are: Social, economic, governmental and physical.

"A partial list of the forces are:

"Social: (1) Population growth and decline; (2) shifts in population density; (3) changes in family size; (4) attitude toward educational and social activities.

"Economic: (1) Natural resources; (2) employment trends and wage levels; (3) commercial and industrial trends; (4) available money and credit; (5) price levels, interest rate, tax burdens.

"Governmental: (1) Zoning laws; (2) police and fire regulations; (3) U. S. D. A. policies; (4) monetary policies which affect the free use of real estate.

"Physical: (1) Climate and topography; (2) soils; (3) mineral resources; (4) transportation, schools, churches, recreation areas; (5) flood control; (6) soil conservation.

"These forces, either singly or in combination, set the pattern for variables in real estate values.

"For appraisal, assessment and equalization purposes, it is necessary to divide the State of Kansas into several districts. These districts should be composed of factors that will result in homogenous and/or comparable districts.

"To accomplish this, a research program was developed to obtain the necessary data to make a conclusion of the number and content of districts required. Among the items considered were: (1) Climate; (2) soils; (3) crops and cropping practices; (4) hazards; (5) income and expenses; (6) sales.

"After considering the items listed above, and others, it was determined that to divide the State of Kansas into nine (9) districts would be both reasonable and practical.

"The soil survey for individual counties prepared by the Soil Conservation Service in cooperation with Kansas State University, where available, were used as source documents to identify soils and land capability classifications found in the district and were both referred to in defining district boundaries. Among the items considered were: (1) Texture of soil; (2) depth of soil; (3) permeability of soil; (4) slope; (5) drainage; (6) erosion; (7) terrain." (Emphasis added.)

It is to be noted the Director specifically recognized "agricultural investment" property to be a *subclass* of property.

The Director in his brief recognizes and admits that his plan is not perfect but contends *it is a move toward better statewide equalization than presently exists*. The Director in his brief says:

"So, within districts positive equalization of rural agricultural investment property was actually accomplished.

"It is submitted that this could not have been accomplished on a completely statewide basis. Buffalo grass cannot be compared with blue stem pasture. The cow carrying capacity is just simply different. Brown county corn land cannot be compared with Thomas County dry wheat land. Irrigated land in Finney County cannot be compared with irrigated land in Gove county. Can Sumner county farm land be compared with farm land in Cherokee County? Rural land in Johnson County cannot be compared with rural land in Wallace County. It would seem reasonable to divide the state into districts where comparisons can be made. While some inequities might appear along district lines, these inequities do not approach the size that would exist if the whole state were one big district, or if we return to the intolerable situation where each county existed as a district unto itself."

It is amusing that the Director argues there exists no common denominator upon which "agricultural investment" property of the state can be equalized. By the very definition of "agricultural investment" property stated in 79-503, *supra*, it consists of the farmlands of the state which are operated as units *for the production of income*. The statute itself (K. S. A. 79-503) defining how real property in the state should be valued for assessment purposes provides that *the income factor shall be used*. The statute also *requires* that such other factors enumerated as may be appropriate be used. These include *productivity, earning capacity as indicated by lease price or capitalization of net income; and rental or reasonable rental values*. These all pertain to *the income approach* in the valuation of farmlands.

Nowhere in Exhibit No. 2, heretofore quoted, has the Director in his explanation of the assessment equalization considered the income approach. In fact, the only place income and expenses were recognized was said to permit the Director to make a conclusion of the number and content of districts required. In short, the Director in his assessment equalization has completely ignored K. S. A. 79-503.

In an attempt to circumvent this requirement the Director proceeded as follows, quoting from his brief:

"The director reasonably judged that the 1970 abstracts of value for rural

agricultural investment land represented a faithful attempt by the various Kansas County Assessing Officials to arrive at the full fair market value and then assess at 30% thereof. In doing so the directives are not a substitute for the judgments of the local county assessing officials, nor is it the Director's appraisal. Rather, the directives constitute a process whereby a 'level' of fair market value is determined by obtaining a 'median' of the collective judgment of all the assessors within a given district as to the fair market value of a particular category of rural land. If the director had disregarded the reappraisals in the various counties and had undertaken equalization based on his own reasoning, such as using only the sales ratio study in each county as the basis of equalization, without co-relating that study to the reappraisals, the directives might well be considered unreasonable and arbitrary."

The director assumes he could have used the ratio study, contrary to legislative mandate. (K. S. A. 79-503 [*j*]; and *Northern Natural Gas Co. v. Williams*, 208 Kan. 407, 493 P. 2d 568.)

It is submitted the common denominator by which all "agricultural investment" property in the state can be valued for purposes of equalization in the assessment process has been completely ignored. The income which "agricultural investment" property is capable of producing in terms of money serves as a satisfactory basis to equalize the valuation and assessment of such property throughout the state.

The valuation of property for tax purposes is an administrative function. (*Board of County Commissioners v. Brookover*, 198 Kan. 70, 422 P. 2d 906; and *Mobil Oil Corporation v. McHenry*, 200 Kan. 211, 436 P. 2d 982.) Equalization is a function in the process whereby property is valued. The standards prescribed by the legislature in delegating this function to the Director of Property Valuation and other assessing officials are set forth in K. S. A. 79-501 and 79-503.

In determining the validity of assessments of real property for taxation purposes, the essential question is whether the standards prescribed by 79-503, *supra*, have been considered and applied by taxing officials, or intentionally and grossly disregarded. (*Garvey Grain, Inc. v. MacDonald*, 203 Kan. 1, 453 P. 2d 59.) Compliance with the provisions of the statute is mandatory upon assessing officials in assessing real property. This includes officials engaged in the process of equalization. (*Northern Natural Gas Co. v. Dwyer*, 208 Kan. 337, 492 P. 2d 147.)

The income approach is one of the two basic methods used to determine the value of agricultural lands, and, as heretofore noted,

must be used as one of the approaches in valuing "agricultural investment" property. (79-503, *supra.*)

The relationship of land income to land values was reported by the United States Department of Agriculture in Department Bulletin No. 1224, dated June 11, 1924. This Bulletin was the product of an extended study conducted in this country by the United States Department of Agriculture for a period of years prior thereto. Since that time the art of valuing agricultural lands by the income approach has become scientifically refined. For many decades in the department of agriculture at Kansas State University the subject of valuing agricultural lands by the income approach has been taught to students in economics and agriculture.

It is not the purpose of this opinion to write a treatise on the subject, but recent authoritative texts widely used in teaching the subject of farmland appraisal throughout the universities in this country are: *Farm Appraisal* (3rd Ed.) by William G. Murray, Professor of Economics, Iowa State College, published by the Iowa State College Press, Ames, Iowa, in 1954; *Farm Appraisal and Valuation* (5th Ed.) by William G. Murray, published by the Iowa State University Press, Ames, Iowa, in 1969; *Agricultural Finance* (5th Ed.) by Aaron G. Nelson and William G. Murray, published by the Iowa State University Press in 1967; *Land Resource Economics* by Raleigh Barlowe, published by Prentice-Hall, Inc., Englewood Cliffs, New Jersey, in 1958; and *Rural Appraisals* by Earl F. Crouse and Charles H. Everett, published by Prentice-Hall, Inc. in 1956.

These authoritative references provide sufficient guidelines for the equalization of farmland valuations, and indicate among other things "bench marks" used by agricultural financing institutions in the valuation of farm real estate. A "bench mark" is familiar to the Director of Property Valuation. (See *Northern Natural Gas Co. v. Dwyer,* supra.)

In the book entitled *Rural Appraisals,* supra, it is said:

"Income capitalization is the direct and primary approach to value. This 'earnings value' can be developed to a large extent from definite mathematical data. *Earning capacity is the foundation on which the American Rural Appraisal System is built.*

"The income capitalization approach to value is based upon the monetary returns that may reasonably be expected from the future operation of the property. The gross income is estimated and expenses are deducted. Typical operation and management are assumed. The net income is then capitalized to obtain the property value based upon income or earnings.

*"Income is calculated on a rental basis if possible. This is on the theory*

*that rent share is the portion of production accruing to ownership.* It is simpler to estimate the rent share and owner's expenses than to deduct all expenses, including operating costs, from total production.

"The Farm Credit Administration has been among the pioneers in the use of income capitalization in land appraising. They are compelled by law to make the earning power of the land a principal factor in appraisal. Appraisers for Federal Land Bank loans have for years used capitalized earnings as a check against their values, determined by the comparative process.

*The income capitalization method of determining land values, when reduced to its simplest terms, is not a highly complicated process. . . ."* (pp. 14, 15.) (Emphasis added.)

The valuation of agricultural land by the income approach is commonly expressed by the following equation:

$$\text{Value} = \frac{\text{Annual Net Income}}{\text{Capitalization Rate}}$$

The sales price approach is commonly expressed by the following equation:

$$\text{Sales Value} = \frac{\text{Annual Net Income}}{\text{Capitalization Rate}} \pm \text{Intangibles}$$

The income capitalization method of appraisal is based largely upon the capacity of a farm to produce net income. In using this method it usually is assumed that the values of farms in an area will have a fairly consistent relation to the average annual net income they will produce over a period of years. The relation, or ratio, which farm values in an area may have to net incomes, is called the capitalization rate for the area. Sometimes this rate is the same as the percentage rate charged on farm mortgage loans in the area, but it may be considerably higher or lower than the loan rate.

To illustrate the gross discrimination resulting from the directives issued by the Director of Property Valuation in this case, a few specific examples taken from the directives set forth in the record will be sufficient. In District No. 7 (see appendix to court's opinion) pertaining to "agricultural investment" properties for the year 1971 (Exhibit No. 5g—giving the average assessed value per acre per subclass and grade by county, after adjustment as ordered by the Director) the assessed valuation of Native Grass Land No. 1 was equalized in each of the ten counties of the district at $23 per acre. For Native Grass Land No. 2 it was equalized at $14 per acre.

Basically, District No. 7 covers the Flint Hills of Kansas and consists largely of native grassland. The simplest case possible will be used for illustration—that is, unimproved Native Grass-

land No. 1, the best in the Flint Hills, which has nothing but a fence around it. Such native grassland will produce at most $6 per acre gross income for the landlord. Deducting ad valorem taxes which will approximate $1.20 per acre annually, the net return to the landowner is $4.80 per acre. Using the capitalization formula and a 6% capitalization rate (the legal rate of return authorized by K. S. A. 16-201) yields a value of $80 per acre. Applying the assessment rate of 30% to $80 per acre results in an assessed valuation of $24 per acre.

In comparing the assessed valuation determined by the income approach with the assessment equalization of $23 per acre it would appear the director's order for District No. 7 with respect to Native Grass No. 1 was accurate. That is, it resulted in an assessed valuation varying less than "ten percent (10%) of such thirty percent (30%)" as required by K. S. A. 79-1439.

The foregoing assessment equalization should now be compared with that in District No. 8 for 1971. For this district the directive discloses that Cultivated Bottom Land No. 1 was equalized at $61 per acre; that Cultivated Bottom Land No. 2 was equalized at $46 per acre; that Upland Cultivated Land No. 1 was equalized at $39 per acre; and that Upland Cultivated Land No. 2 was equalized at $25 per acre.

Brown County in District No. 8, for example, whose Bottom Cultivated Land No. 1 was originally assessed at $71 per acre, Cultivated Bottom Land No. 2 at $57 per acre, Upland Cultivated Land No. 1 at $69 per acre, and Upland Cultivated Land No. 2 at $49 per acre, *was reduced in equalizing the assessments for these respective categories by 14%, 19%, 43% and 49% respectively.* For Doniphan County the directives were similar, a substantial reduction in assessments was ordered by the Director.

The *Farm Facts Bulletin* issued by the Kansas State Board of Agriculture for the years 1968-1969, 1969-1970 and 1970-1971 (the same source material used by the Director to prepare his Exhibit No. 3 in the record) discloses the average corn yield per acre in Brown County, covering all types of upland and bottom land, was 82 bushels in 1968, 84 bushels in 1969 and 42 bushels in 1970. For Doniphan County the average corn yield per acre, covering all types of upland and bottom land, was 86 bushels in 1968, 86 bushels in 1969 and 60 bushels in 1970.

On January 4, 1971, the price of yellow corn in Topeka was $1.43

per bushel and for white corn $1.88 per bushel. On February 10, 1971, the average price for yellow corn in Topeka was $1.39 and for white corn it was $2 per bushel. On March 1, 1971, white corn went up to $2.10 per bushel.

Now, if calculations are made from the foregoing figures most favorable to the Director, considering the *average* corn yield of all upland and bottom land in Doniphan County for the past three years, and the median price of yellow corn between January 4 and February 10, 1971 (the directives were applicable to the year 1971 and valuations determined as of January 1, 1971), an acre of Doniphan County unimproved corn land with nothing more than a fence around it (using the average corn yield for the entire county) would yield $108.50 per acre gross return. (77 bushels per acre × $1.41 per bushel.)

The landlord's share of the crops from productive agricultural land varies from one-third to one-half. The more highly productive land commands a greater crop share. Commonly in Doniphan County two-fifths of the crop delivered to the nearest market is paid as rent. The crop share to the landlord on the basis of two-fifths rent would yield $43.40 per acre gross return. Ad valorem taxes on the average land planted to corn in Doniphan County annually would approximate $3.40 per acre, thus yielding a net return to the landlord of $40 per acre. Capitalized at 6% the income value of all cultivated land in Doniphan County planted to corn (using the average corn production for the county) would be $666 per acre. An assessment at the 30% level would require a $200 per acre average assessment. *Note particularly that in Doniphan County the Cultivated Bottom Land No. 1 was equalized at $61 per acre. The Cultivated Bottom Land No. 2 was equalized at $46 per acre. The Cultivated Upland No. 1 was equalized at $39 per acre, and the Cultivated Upland No. 2 was equalized at $25 per acre.* The average production of corn in Doniphan County for the preceding three years was produced from all of these categories of cultivated land in the county.

It is probable the Cultivated Bottom Land No. 1 in Doniphan County produced well over 100 bushels of corn per acre on the average and the Cultivated Upland No. 2 produced well under 77 bushels per acre for the three-year average.

The conclusion to be drawn is that all cultivated land in Doniphan County should have been assessed at least 300% higher, at a

minimum, if its assessment is to be equalized with Native Grass Land No. 1 of the Flint Hills.

Similar situations are disclosed by the directives issued equalizing the irrigated and bottom lands of the Kaw Valley. In Douglas County Irrigated Land No. 1 was reduced from $84 per acre to $70 per acre as the assessment equalization value. This land commonly sells on the market between $800 to $1000 per acre.

Another glaring example of discrimination in the directives issued to the 96 counties is the variation in the dollar value assigned per acre for *waste land* in the various districts. In District No. 1 it is assigned $1 per acre; in District No. 2 it is assigned $2 per acre; in District No. 3 it is assigned $6 per acre; in District No. 4 it is assigned $10 per acre; in District No. 5 it is assigned $5 per acre; in District No. 6 it is assigned $7 per acre; in District No. 7 it is assigned $4 per acre; in District No. 8 it is assigned $3 per acre; and in District No. 9 it is assigned $6 per acre. The variation from the low valuation to the high in the various districts is 1000%.

If the assessed value of waste land is to be equalized over the entire state it would appear that the nominal dollar amount per acre should be the same over the entire state, because waste land by definition produces no economic return to the landowner.

The court by slight of hand rejects the gross and arbitrary discrimination above disclosed by saying that it does not vitiate or poison the entire plan of equalization adopted by the Director.

The court graciously extends to individually aggrieved taxpayers a sham escape hatch by citing various statutory remedies to which he may resort. Let us analyze them. *First*, the court cites K. S. A. 74-2438 as providing an appeal by an aggrieved taxpayer to the State Board of Tax Appeals from any finding, ruling, order, decision or other final action of the Director. *But the discrimination present here is approved by the court as inevitable,* and insufficient to vitiate the equalization plan of the Director. In any such action the Director, who represents the Board of Tax Appeals in a lawsuit (K. S. A. 74-2426; and see *Northern Natural Gas Co. v. Dwyer,* supra), has a complete defense—the decision of the court herein which establishes a precedent. *Second,* the court cites K. S. A. 79-1413a which it says furnishes another safeguard—providing that when on complaint of any taxpayer to the State Board of Tax Appeals, it is made to appear that the assessment of taxable real estate in any county is not in compliance with the law, and that

the public interest will be promoted *by reappraisal,* the Board shall order a reappraisal of all or a part of the taxable property in the district. Here again the Director has relied upon the reappraisals in the 96 counties to which his directives have been issued, proclaiming the validity of the reappraisals, and equalizing within each of the 9 arbitrary districts upon the median of such reappraisals within each district. The court's approval of the Director's plan forecloses any relief a taxpayer may have had under this statute. *Third,* the court cites K. S. A. 79-2005 (now K. S. A. 1971 Supp. 79-2005) pursuant to which a taxpayer may pay his taxes under protest, and then bring suit for the recovery thereof within the time fixed by the statute. Relief to an individual taxpayer on the discrimination here disclosed as between one county and another in a protest action has been foreclosed by *McManaman v. Board of County Commissioners,* 205 Kan. 118, 468 P. 2d 243. Furthermore, relief by way of the injunctive route under K. S. A. 60-907 (*a*) on similar facts has been foreclosed in *Harshberger v. Board of County Commissioners,* 201 Kan. 592, 442 P. 2d 5.

It follows that under the present state of Kansas law the farmer or owner of "agricultural investment" real property in the state is defenseless where gross discrimination amounting to constructive fraud is shown to exist. Both the director and the court in its opinion admit discrimination exists between the arbitrarily established districts.

Good faith alone by taxing officials is not enough if assessments are in fact discriminatory. (*Beardmore v. Ling,* 203 Kan. 802, 457 P. 2d 117.)

The right to equal treatment in matters of taxation is also a federal right. The constitutional requirement of equality under the United States Constitution is not satisfied if a state does not itself remove the discrimination. (*Hillsborough v. Cromwell,* 326 U. S. 620, 623, 90 L. Ed. 358, 66 S. Ct. 445; and *Northern Natural Gas Co. v. Dwyer,* supra.)

It is respectfully submitted the equalization orders of the Director of Property Valuation should be set aside and his plan for equalization vitiated.